874 So.2d 66 (2004)
STATE of Louisiana
v.
Darrell James ROBINSON.
No. 2002-KA-1869.
Supreme Court of Louisiana.
April 14, 2004.
Rehearing Denied June 25, 2004.
*70 Danalynn Recer, J. Michael Small, Alexandria, Clive Adrian Safford Smith, New Orleans, for applicant.
Charles C. Foti, Jr., Attorney General, James C. Downs, District Attorney, Thomas R. Wilson, Michael W. Shannon, for respondent.
JOHNSON, Justice.
Defendant was convicted in the 9th Judicial District Court, Parish of Rapides, George Metoyer, J., of four counts of first degree murder in violation of La. R.S. 14:30. This is a direct appeal from the *71 aforementioned convictions and sentence of death, pursuant to La. Const. Art. V § 5(D).[1] The principal issues of this appeal involve: (1) whether the evidence presented at trial was sufficient to support defendant's conviction/evidence was sufficient to establish defendant's identity as the perpetrator, (2) whether the trial court erred in failing to suppress the testimony of a jailhouse informant, (3) whether the trial court was warranted in denying defendant's challenges for cause of prospective jurors, and further, erred in excusing jurors for cause whose views did not impair their ability to impose the death penalty, (4) whether African-American jurors were discriminatorily purged from the panel, (5) whether the admission of photographs from the crime scene violated defendant's right to a fair trial, and (6) whether the imposition of a death sentence was disproportionate.
We affirm defendant's conviction.

FACTS AND PROCEDURAL HISTORY
On May 28, 1996, at approximately 12:10 p.m., Doris Foster arrived at the home of her cousin, Billy Lambert, on Guy Peart Road, in Poland, Louisiana, having made plans to have lunch with him, his sister Carol Hooper, Carol's daughter Maureen Kelly, and Maureen's infant son, Nicholas Kelly. Ms. Foster found the front door locked, which was unusual as it was daytime and because Billy was expecting several members of his family to join him. After retrieving her key and unlocking the front door, Ms. Foster entered the living room and discovered the bodies of her four relatives, all shot in the head and lying in pools of their own blood. Billy had been shot twice, and the other victims had all been shot once.
At trial, Ms. Foster testified that she heard a noise coming from the rear of the house; she therefore left immediately and drove to the nearby Town & Country store to call for help. After the clerk called 911, Ms. Foster returned to the house with the police. Ms. Foster stated at trial that although she had only been gone from the scene a matter of minutes, she noticed that Billy's brown Ford truck, which had been parked adjacent to Maureen's car when she arrived, was now gone.
Defendant, Darrell J. Robinson, had come to live with Billy approximately eight days before the murders, after the two met at the Veteran's Administration Medical Center ("V.A.") where they were both being treated for alcoholism. While the two were still in treatment, Billy invited defendant to live with him in exchange for performing chores on his farm. Several witnesses, including Andrew Dunn, testified at trial that within days of his release, defendant began drinking again. The clerk at the local Town & Country store testified that the defendant purchased a bottle of vodka at approximately 8:30 a.m. on the morning of the murders.
At trial, Gary Normand, who was trimming trees for CLECO on Highway 1, testified that he saw a light brown Ford truck spinning its wheels as it turned off Guy Peart Road at approximately 12:15 p.m. Similarly, Farrell Scallan, who was eating his lunch at the Mini Barn on Guy Peart Road, testified that he saw a light brown Ford truck being driven erratically by a young man with dark hair on Guy Peart Road at approximately 12:15 p.m. Shortly thereafter, and about 11 miles away, Michael Poole encountered the truck *72 on Bayou Bouef Road. Poole testified that the man, whom he later identified as the defendant, was traveling at high speed when he swerved into his lane and side-swiped his own truck, knocking off his driver's side mirror. When the defendant did not stop, Poole pursued him, and solicited the aid of Steve Halbert, a friend and neighbor he passed along the way, to help.
Thereafter, the truck stalled and Poole approached the defendant; subsequently, the two engaged in a heated exchange. Poole testified that he told defendant that he was going to call the police. According to Poole's trial testimony, defendant appeared nervous upon hearing that the police were being summoned, and he continued to try to start the truck. When he finally succeeded, defendant fled the accident scene. Poole signaled to Halbert to follow the vehicle, and Halbert pursued the defendant while Poole called 911 to report the accident. The 911 dispatcher testified that Michael Poole's call reporting the hit-and-run came in at 12:44 p.m.
Halbert testified that during the chase defendant ran other vehicles off the road. Eventually, the truck turned onto a gravel road in Evangeline Parish, where Halbert testified that he saw the truck drive through a fence and then park behind a house. Once he had hidden the vehicle, defendant disappeared into the nearby woods.
The police arrived soon after and began searching the woods for defendant. Two detectives from the Rapides Parish Sheriff's Office, Mike Stephens and Joe Bartlett, located defendant in the woods, crouching behind a mound of dirt. The officers approached defendant with their guns drawn and ordered him onto the ground. According to the trial testimony of Det. Stephens, upon defendant's apprehension, he blurted out: "I'm not armed. I don't have a gun." In addition, Det. Stephens testified that while he and Det. Bartlett were placing defendant in handcuffs, he further volunteered, "I'm on medication for violent tendencies." Det. Stephens' statements were corroborated by the trial testimony of Det. Bartlett.
After apprehending the defendant, the officers conducted a safety pat-down; during their search they recovered a yellow pocket knife, however, no firearms were found. Although authorities searched the route between the crime scene and the place where defendant was arrested extensively, the murder weapon was never located.
After his arrest, the police seized defendant's clothing for testing. Scanning electron microscopy analysis was performed, which detected gunshot residue particles on defendant's t-shirt, the waistband of his blue jeans, and on the shorts he was wearing under his blue jeans. Further, two drops of blood, matching the DNA of victim Nicholas Kelly, were found on Defendant's left shoe and shoe lace.
Based upon this and other evidence, defendant was indicted on four counts of first degree murder on June 20, 1996 in connection with the deaths of Billy Lambert and his family. On June 21 and 22, 1996, in response to defendant's motion to set bail, the trial court held a preliminary hearing. At the conclusion of that hearing, defendant's motion was denied, and he was incarcerated at the Rapides Parish Detention Center while awaiting trial. Throughout 1999 and 2000, the trial court held hearings on various pretrial motions. On no less than four occasions, defendant moved for a change of venue. On September 7, 1999, the trial court revisited the issue and granted defendant's motion for change of venue, and allowed a jury to be selected from St. Landry Parish.
*73 While incarcerated at the Rapides Parish Detention Center, defendant was assigned to share a cell with Leroy Goodspeed on October 29, 1997. On November 11, 1997, according to Goodspeed's testimony, defendant confessed to him, "I did those people, a man, two women and a small child, and threw the gun off a bridge." On November 14, 1997, Leroy Goodspeed conveyed defendant's statements to Steve Wilmore, the lead investigator from the Rapides Parish Sheriff's Office, who subsequently informed the assistant district attorney assigned to the case of defendant's statements.
Jury selection commenced on February 12, 2001 in St. Landry Parish. After conducting individualized sequestered voir dire, a panel of twelve jurors and one alternate was chosen. Thereafter, the case was returned to Rapides Parish, where the trial took place in accordance with La. C. Cr. P. art. 623.1. Defendant's trial commenced on March 3, 2001. On March 12, 2001, the jury returned four verdicts of guilty as charged of first degree murder.
The penalty phase began on March 13, 2001, and the following day, the jury unanimously returned four recommendations for death. To support its recommendation regarding counts one, two and three, which involved the adult victims Billy Lambert, Carol Hooper, and Maureen Kelly, the jury found the one aggravating circumstance urged by the State, namely that the offender knowingly created a risk of death or great bodily harm to more than one person pursuant to La.C.Cr.P. art. 905.4(A)(4). With regard to count four, which involved infant victim Nicholas Kelly, the jury found both aggravating circumstances urged by the State, namely that the offender knowingly created a risk of death or great bodily harm to more than one person pursuant to La.C.Cr.P. art. 905.4(A)(4), and that the victim was under the age of twelve years pursuant to La.C.Cr.P. art. 905.4(A)(10).
Defense counsel filed a motion for new trial, which was denied on April 9, 2001. Thereafter, the judge imposed the sentence of death in accordance with the jury's verdicts. Defendant now appeals his convictions and death sentence on the basis of 24 assignments of error.

DISCUSSION
This is a capital case in which all assignments of error are reviewed. This court has an independent obligation to examine the record for passion, prejudice, or arbitrary factors which may have contributed to the jury's recommendation of death, despite the lack of contemporaneous objection or the failure to brief an argument. State v. Sonnier, 379 So.2d 1336, 1358 (La.1979), appeal after remand, 402 So.2d 650 (La.1981), cert denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983); see LSA-C.Cr. P. art 905.9. Defendant assigns twenty-four errors as the basis for his appeal before this Court. In this opinion we will treat eight assignments of error (1, 2, 3, 4, 5, 14, 23, 24) and review the sentence to ensure that it is not excessive. The assignments of error not discussed in this opinion do not represent reversible error and are governed by well-settled principles of law. These assignments of error will be reviewed in an unpublished appendix which will comprise a part of the official record in this case.

I.
Defendant argues that the evidence presented at trial was insufficient to prove his identity as the perpetrator of the murders. Defendant's argument is two-fold. In his first assignment of error, defendant contends that the evidence presented by the State was insufficient to prove that he *74 fired the shots that killed the victims or that he intended their deaths. Included in defendant's first assignment of error is his allegation that the testimony of the State's jail-house informant, Leroy Goodspeed, is the "the thin and brittle reed" upon which the State was able to build its case, and without which, his conviction would not have been obtained. Defendant re-urges the unreliability of the State's jail-house informant in his second assignment of error, wherein he alleges that the testimony should have been suppressed as it was too incredible to be believed. In the interest of clarity and economy, we address all of defendant's objections to Goodspeed's testimony Section II, which addresses defendant's second assignment of error.
A. Sufficiency of the Evidence
The defendant does not dispute that four first degree murders occurred in this case, therefore, the issue before this court is not whether the evidence was legally sufficient to prove the shooter's specific intent to kill or cause great bodily harm, as all four of the victims in this crime were found shot in the head at a close range. Instead, this Court must determine whether the evidence presented by the state was legally sufficient to prove the defendant's identity as the perpetrator. To that end, defendant contends that the State failed to exclude the hypothesis that the murder was committed by another person. He points to the following evidence as creating a hypothesis of his innocence: the failure of the State to present an eyewitness to the shootings, the fact that the murder weapon was never recovered, gunshot residue tests were not conducted on his hands and forearms to determine whether he had recently discharged a firearm, and "blowback" blood spatter evidence was not resent on his clothing. The defendant argues that the evidence presented by the State supports his version of the events, which was that he entered the house, and upon surveying the horrifying scene, panicked and fled. We disagree, and find that the evidence presented by the State was sufficient to prove defendant's identity as the perpetrator of these crimes to the jury beyond a reasonable doubt.
With regard to the three adult victims, in order to convict the defendant of first degree murder, the State was required to prove: 1) that the defendant possessed the "specific intent to kill or inflict great bodily harm upon more than one person." La.Rev.Stat. 14:30 A(3). With regard to the infant victim, the State urged that in addition to having the specific intent to harm more than one person, defendant also possessed specific intent to kill "a victim who is under the age of twelve." La.Rev.Stat. 14:30 A(5). Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.Rev.Stat. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the defendant's actions and the circumstances of the transaction. State v. Maxie, 93-2158, (La.4/10/95), 653 So.2d 526, 532. Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill. State v. Seals, 684 So.2d 368, 373 (La.1996) (citing State v. Williams, 383 So.2d 369 (La.1980); State v. Procell, 365 So.2d 484 (La.1978)).
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the *75 prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Neal, 00-0674, (La.6/29/01) 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Neal, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing State v. Rosiere, 488 So.2d 965, 968 (La.1986)).
The circumstantial evidence presented at defendant's trial excluded any reasonable hypothesis of his innocence. The jury heard testimony from Doris Foster that she and Carol Hooper, one of the three adult victims, told defendant that if he continued to abuse alcohol he would not be allowed to continue to live with Billy. Further, Billy's second cousin, David Peart, testified that Billy confided in him the night before the murders that defendant had begun drinking again. Billy further confided "I've had enough of him. He's out of here tomorrow. He's on the way back to the V.A." On the morning of the murders, defendant was seen driving Billy's truck on lower Third Street in Alexandria, Louisiana, although Doris Foster testified that Billy had recently purchased the truck and did not allow defendant to drive it. The jury also heard testimony from Gary Normand and Farrell Scallon that defendant was seen fleeing Guy Peart Road, where the murders took place, driving Billy's truck erratically.
Further, although the murder weapon was never retrieved, several witnesses testified that Billy owned a revolver, which he kept on his headboard in his bedroom, which was across the hallway from defendant's bedroom. Detective Steve Wilmore, the lead investigator, testified that despite an extensive search for Billy's revolver, the weapon was never recovered. Evidence was presented that the victims were shot a total of five times with .38 caliber bullets, which is the same size ammunition used by the revolver Billy Lambert owned. Further, Doris Foster gave extensive testimony that at the time of the murders, Billy's revolver was loaded with only five bullets. Ms. Foster explained that Billy had asked her to keep his guns while he was in treatment at the V.A. hospital, and he specifically removed the shells from the revolver in question at her request because she was afraid to keep a loaded weapon in her home. Upon Billy's release from the V.A., Ms. Foster returned the revolver to him, but forgot to return one of the six bullets.
Officers who searched the house found Billy's wallet in the defendant's bedroom without any money in it. When defendant was apprehended, officers recovered a yellow pocket knife identified as belonging to Billy Lambert, a pack of Marlboro Lights cigarettesthe brand Billy smoked, and seventy-one dollars in cash in defendant's wallet, notwithstanding the fact that defendant was unemployed.
In addition to the aforementioned circumstantial evidence presented by the State to identify the defendant as the individual who shot Billy Lambert and his family, the jury also heard testimony from Alfred J. Schwoeble, an expert in gun Shot residue analysis (GSR), who examined the clothing worn by defendant on the *76 day of the shootings.[2] Schwoeble testified that he found two particles unique to gun shot residue, one particle characteristic of gun shot residue, and three lead rich particles on the waistband of defendant's jeans. Further, Schwoeble found one particle characteristic of gun shot residue on defendant's t-shirt.
Defendant contends that the particles could have easily been transferred to his clothing from the two police officers who apprehended him, as they both approached him with weapons drawn. Detectives Stephens and Bartlett testified that their service revolvers had been cleaned six months prior to the arrest and had not been subsequently discharged. Further, the detectives testified that upon apprehending defendant they performed a routine pat-down, which involved patting from the upper body down to the lower body. Based upon the statements of the detectives, Schwoeble testified that more particles should have been present on the t-shirt than the waistband of the pants if the GSR was transferred from the detectives' contaminated hands to his clothing. Thus, in Schwoeble's opinion, the number and location of the particles were indicative of either a discharged weapon being placed in the waistband of the jeans or contamination by touching the waistband with hands which had recently fired a weapon.
Defendant attempted to controvert Schwoeble's testimony by presenting the testimony of GSR expert Patricia Eddings, who testified that it was common for particles of GSR to remain on a weapon and in the holster after cleaning. Further, testimony elicited at trial also pointed out that defendant was patted down several times by several different law enforcement officers upon his arrest, including Lieutenant Dewayne Fontenot of the Evangeline Parish Sheriff's Office.
In addition to the particles present on defendant's shirt and the waistband of his pants, Schwoeble testified that the heaviest population of particles were present on the right leg of the blue jeans, where there *77 were six particles characteristic of gun shot residue and forty lead rich particles. According to Schwoeble, the fact that the particles were on the right side of the pants was significant because it indicated that if the particles did come from a discharged weapon, it would most likely have been discharged on the right side in a downward direction, which was consistent with defendant, who is right-handed, firing a weapon at Nicholasthe infant victim.
Defendant contends, first and foremost, that none of the particles discovered on his right pant leg were unique to GSR. Defendant's GSR expert testified that particles characteristic to gun shot residue are common and may be present on clothing without having discharged a firearm. Further, defendant argues that the fact that the particles were found on the right leg of his pants is insignificant because, since he is right-handed, he would naturally pick up more particles characteristic of GSR in his right hand and then transfer those particles to the right leg of his pants.
Further, defendant argues that too great an opportunity for contamination existed to permit the GSR analysis testimony which was presented at trial. He points to the cross-examination of Schwoeble, where he admitted that all of the clothing retrieved from defendant on the day of the murders were placed in one bag. Both Schwoeble and Detective Anthony Ribaudo, of the Rapides Parish Sheriff's Office, testified that proper protocol when dealing with evidence that may contain GSR is to separate the items to avoid cross contamination. Further, Defendant points out the fact that no GSR tests were conducted on his hands and forearms to determine whether he had recently discharged a firearm, even though such testing was common in 1996 when the shootings occurred. In addition, gunshot residue particles were found on the sleeve of a red jacket found at the murder scene, even though the number of particles were too few to indicate that the jacket had been worn by the shooter, and no explicable answer was given by the State's expert for its presence.
However, in addition to evidence of gunshot residue on defendant's clothing, the state also presented DNA evidence which linked defendant to the scene of the murders.[3] Curtis Knox, an expert in the field of DNA evidence, testified that a towel was found in Billy's bedroom bearing a drop of Nicholas Kelly's blood. In addition, two drops of Nicholas Kelly's blood were found on the bottom of defendant's left shoe and on the shoe lace. Defendant alleges that the small amount of blood found on his shoe is not consistent with the *78 atrocious crime that occurred. Defendant asserts that it is impossible to shoot four people at close range and not have blood splatter onto his clothing, thus, he contends that the evidence supports his recitation of events: that he entered the house, and upon witnessing the bodies, panicked and fled. However, defendant's contentions are arguments, they are not evidence. DNA analysis is a well-established science, and Nicholas Kelly's blood, retrieved from defendant's shoe and shoelace at the time he was apprehended, prove that he was present at the murder scene. The DNA evidence presented, when considered in globo with the other evidence presented by the State, is sufficient under Jackson to exclude every reasonable hypothesis of innocence and prove guilt beyond a reasonable doubt.
In the instant case, the State presented ample evidence of defendant's guilt. All of the evidence presented supports and corroborates that Leroy Goodspeed, the jailhouse witness, was testifying reliably. Thus, the jury was within the bounds of rationality to reject as unconvincing defendant's hypothesis of innocence that, like Doris Foster, he also happened innocently upon the crime scene. Therefore, we find that defendant's sufficiency claim fails on the merits.

II.
A large portion of defendant's first and second assignments of error are intertwined. In much of his first assignment of error, defendant argues that the evidence presented by the State is insufficient to prove guilt beyond a reasonable doubt, and without the testimony of the jail-house informant, Goodspeed, the conviction would not have been obtained. In his second assignment of error, defendant argues that the testimony of Goodspeed should have been suppressed as too incredible to be believed.
A. Credibility of Jailhouse Informant
Defendant alleges that Goodspeed suffered from such poor character that his testimony was not worthy of belief, and since Goodspeed's testimony is the foundation upon which defendant's conviction stands, the evidence presented is insufficient to support the conviction. We disagree, and find the trial court's decision to deny defendant's motion to suppress Goodspeed's testimony was reasonable; the court was well-informed of Goodspeed's character flaws and determined that his testimony was credible. We afford that decision due deference. Further, we find that the jury's decision to accept Goodspeed's trial testimony as credible was reasonable.
Clearly, as demonstrated by Section I, Subpart A infra, the quantum of the State's proof was significantly more than the testimony of Leroy Goodspeed. However, even accepting defendant's erroneous premise, La. C.E. art. 601 establishes the general rule that "every person of proper understanding is competent to be a witness except as otherwise provided by legislation." Furthermore, a witness may testify to a matter based on personal knowledge. La. C.E. art. 602. Finally, this Court has never ordered a blanket exclusion of jailhouse witness testimony. See State v. Divers, 94-0756, pp. 3-4 (La.10/11/96), 681 So.2d 320, 322; State v. Martin, 93-0285, pp. 3-5 (La.10/17/94), 645 So.2d 190, 193-94; State v. Carmouche, 480 So.2d 728, 729 (La.1985), rev'd after remand, 508 So.2d 792 (La.1987).
Further, this court's authority to review questions of fact in a criminal case does not extend to credibility determinations made by the trier of fact. La. Const. Art. 5, § 10(B); State v. Williams, *79 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of witnesses in whole or in part. State v. Bosley, 691 So.2d 347; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir. 1986), writ denied, 499 So.2d 83 (La.1987). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28, 095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied 98-0282 (La.6/26/98), 719 So.2d 1048.
In State v. Hill, the defendant was convicted of second degree murder for beating an elderly woman to death during the commission of a robbery. State v. Hill, 601 So.2d 684, 686 (La.App. 2 Cir.1992). Similar to the instant case, defendant admitted his role in the murder to his cell-mate while housed in the Ouachita Parish Jail awaiting trial. State v. Hill, 601 So.2d at 688. On appeal, defendant asserted that the trial court erred in denying the defense motion to exclude the testimony, alleging that the informant was placed in his cell for the purpose of eliciting incriminating information. Id at 689. The Second Circuit Court of Appeal found this argument without merit, as no evidence was presented that the statements were not voluntary, that anyone asked the informant to obtain information from the defendant, or that the informant obtained anything of value in exchange for gathering or divulging information about the defendant.
Id.
The facts in Hill are analogous to those present in the instant case. Prior to Goodspeed testifying at trial, the trial court held a pretrial hearing on defendant's motion to suppress his testimony. During cross-examination, defendant's counsel attempted to portray Goodspeed as suffering from "antisocial personality disorder" based upon a lifetime of drug abuse. He also argued that at the time Goodspeed was at the Rapides Parish jail, he was awaiting trial for felony theft, robbery, battery, numerous traffic violations, flight from an officer, and possession of drugs and drug paraphernalia. Goodspeed admitted at trial that he hated jail "with a passion" and would do everything in his power to avoid being there.
In addition, counsel for defendant pointed out that Goodspeed originally faced a possible sentence of thirty-three years of imprisonment at hard labor, but as a result of his cooperation, he was sentenced to three years imprisonment, with one year suspended. Goodspeed acknowledged that he was released after eleven months, but explained that he was not given a deal for relating defendant's confession. A review of Goodspeed's motion hearing testimony reveals that he spoke intelligently and truthfully articulated his own shortcomings of addiction, arrests, and convictions.
At the conclusion of the motion hearing, the trial court took the admissibility of Goodspeed's testimony at trial under advisement, and ultimately ruled to allow Goodspeed to testify as to defendant's confession. At trial, defense counsel reminded the jury that Goodspeed had been arrested 24 times, amassed six felony convictions, is mentally ill, takes Haldol for auditory hallucinations, and has admitted that he will say or do anything to get out of prison, where he has spent most of his adult life. Thus, the defense ensured that the jury heard every possible reason to reject Goodspeed's testimony, and in their capacity as judges of the credibility of witnesses, the jurors gave Goodspeed's testimony whatever value they deemed proper. We find that the trial testimony offered by Goodspeed was not so lacking *80 in reliability that its introduction for jurors to consider in evaluating the question of defendant's guilt or innocence denied defendant a fundamentally fair trial. The trial court, therefore, did not err in finding that Goodspeed's testimony relating defendant's confession was admissible at trial.
B. Goodspeed Planted in Defendant's Cell by State
In addition to alleging that Goodspeed's testimony was unreliable, Defendant further contends that Goodspeed's testimony should have been excluded because he was acting as an agent of the State. Specifically, defendant argues that while he was incarcerated at Rapides Parish Detention Center awaiting trial, defense counsel filed a "Motion to Prevent Creation of Snitch Testimony", requesting that defendant be placed in a cell by himself and not exposed to anyone except defense counsel. Defendant argues that the State intentionally placed Goodspeed in a cell with him, long after the right to counsel attached in an attempt to create "snitch" testimony. We disagree, and find that Goodspeed was not acting as an agent of the State in violation of defendant's Fifth and Sixth Amendment rights. Further, the trial court did not err in allowing Goodspeed to testify to the jury regarding defendant's confession.
When a defendant has been formally charged with a crime and has invoked his Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel, the government may not use an undercover agent or informant to circumvent these rights. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); see also State v. Brown, 434 So.2d 399, 402 (La.1983). In Massiah, the Supreme Court ruled that the government overstepped constitutional bounds by outfitting an informant's car with a radio transmitter and arranging a meeting with the accused. Massiah, 377 U.S. at 206-07, 84 S.Ct. at 1203. In reversing the conviction, the Supreme Court held that the Sixth Amendment prohibits deliberate elicitation by the government or its agents of incriminating information from a defendant after he has been indicted and in the absence of his counsel. Massiah, 377 U.S. at 201, 84 S.Ct. 1199.
Defendant relies upon Massiah v. United States, arguing that placing Goodspeed in his cell violated his Fifth and Sixth Amendment rights. This reliance is misplaced. The Court in Massiah found active governmental participation to elicit incriminating statements; in the instant case, there is no evidence of active involvement by the State.
The record reflects that Goodspeed was placed in the cell with defendant through normal procedures. Specifically, the testimony of Warden Vernon Creecy of the Rapides Parish Detention Center established that the jail has only two cells which inmates may occupy by themselves. One of those cells is reserved for inmates under suicide watch, and the other is used for protective custody. Therefore, the facility could not readily comply with the defense request for privacy because of limited accommodations. Warden Creecy further testified that during the nearly five years defendant was incarcerated at his facility awaiting trial, over 100 inmates shared the cell with defendant. To claim that the State intentionally paired Goodspeed as defendant's cell mate defies logic.
In an attempt to qualify Goodspeed as an agent of the State, defendant alleges that Goodspeed was granted a reduced sentence in exchange for his testimony. However, the trial court heard testimony *81 from Goodspeed's attorney, W.T. Armitage, in which he testified that when he entered into plea bargain negotiations with the District Attorney's office the fact that Goodspeed was a possible witness in defendant's trial was never discussed, nor was the judge made aware of the fact that Goodspeed was prepared to testify in defendant's case. Furthermore, during a motion hearing to exclude Goodspeed's testimony, Loren Lampert, the assistant district attorney prosecuting Goodspeed, testified that his status as a witness against defendant was not a consideration in the plea bargain negotiations.
C. Defendant Prejudiced Because Lead Counsel was Forced to Testify at Trial
Defendant further alleges that the trial court's decision to allow Goodspeed's testimony resulted in prejudice to his defense, as one of defendant's attorneys, Mike Small, was forced to testify at trial in order to impeach Goodspeed regarding a discussion which allegedly took place between the two.[4] We disagree, and find that the defendant suffered no prejudice when his defense attorney took the stand to impeach Goodspeed. First, contrary to defendant's arguments, Small was not forced to take the stand at trial, as the trial court had earlier ruled that the conversation between Small and Goodspeed did not constitute solicitation of a bribe. Thus, the decision to testify during trial was a matter of trial strategy. Further, defendant was not without representation when his lead counsel took the stand, as Clive Stafford-Smith, Sue Ann Kelly, and Dana Lynn Recer all were present and serving as defendant's legal advocates. Thus, at no time during his representation did defendant not have competent counsel protecting his interests.
In what can be best described as a misunderstanding, an exchange occurred between Small and Goodspeed which resulted in the defense filing a pleading on August 9, 2000 captioned, "Motion to Exclude the Testimony of Jailhouse Snitch Leroy Goodspeed who Solicited a Bribe from Defense Counsel or Alternatively to Withdraw as Trial Counsel in Order to Appear as a Witness for Darrell James Robinson."
The State opposed the motion and a hearing was held on August 23, 2000 at which both Leroy Goodspeed and Mike Small testified. Thereafter, on October 20, 2000, the trial court denied the defense motion to exclude Goodspeed's testimony, finding that the interview between the two did not constitute solicitation of a bribe on Goodspeed's part. Subsequently, the trial court ruled that no ethical bar precluded Small from continuing his representation of defendant, and where Small was required to serve as a witness, defendant's interests would be represented by co-counsel Clive Stafford-Smith.
Having ruled that Goodspeed's statements to Small did not equate to solicitation of a bribe, the trial court saw no reason to deprive defendant of representation by the criminal defense attorney who *82 had represented him for over four years. As to this assignment of error, no relief is warranted.

III.
Defendant's third, fourth, and fifth assignments of error all relate to alleged errors on the part of the trial court with regard to jury selection. As a result of these errors, defendant claims he was deprived of his right to exercise peremptory challenges, his right to a fair and impartial jury, and his right to a reliable determination of sentence. Defendant alleges that the trial court's rulings violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as Article I, §§ 16, 17, and 20 of the Louisiana Constitution of 1974.
A. Trial Court Refused to Excuse for Cause Death-Qualified Jurors
In his third assignment of error, defendant contends that the trial court refused to excuse for cause jurors who expressed an unwillingness to be impartial with regard to the death penalty. Specifically, defendant alleges that the trial court employed a "vague and wholly arbitrary" standard for death qualification whereby the judge used a shorthand phrase for excusing prospective jurors for whom his "radar went up." Defendant contends that this methodology made jury selection highly subjective, and further, that it was difficult to calibrate the trial judge's so-called "radar" from day to day. We disagree, and find that the voir dire process did not violate defendant's rights to a fair and impartial jury as the jurors at issue did not display a reluctance to consider a life sentence.
The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[5] In the "reverse-Witherspoon" "context, the basis of the exclusion is that a prospective juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him...." State v. Robertson, 92-2660, (La.1/14/94) 630 So.2d 1278, 1284.[6] Jurors who cannot consider both a life sentence and a death sentence are considered "not impartial," as they cannot "accept the law as given ... by the court." La.C.Cr.P. art. 797(2), and (4); State v. Maxie, 93-2158, (La.4/10/95), 653 So.2d 526, 534-35. In other words, if a prospective juror's views on the death penalty are such that they would "prevent or substantially impair the performance of their duties in accordance with their instructions *83 or their oaths," whether those views are for or against the death penalty, he or she should be excused for cause. State v. Taylor, 99-1311, p. 8 (La.1/17/01), 781 So.2d 1205, 1214.
Applying these precepts to the responses of the 12 prospective jurors challenged for cause and about whom defendant now complains, the record supports the trial court's decision to deny the defense's challenges. The trial court conducted individual, sequestered voir dire of the prospective St. Landry jurors who would serve on this case in Rapides Parish. While a few of the less sophisticated jurors necessitated rehabilitation by the State to clarify their voir dire responses, none of the jurors exhibited a bias in favor of the death penalty or an unwillingness to follow the judge's instructions. In all respects, the court exercised great caution so as not to incur error which could result in mistrial and negate the time expended by these borrowed citizens.
B. Jurors that Satisfied Witherspoon Standard Were Excused for Cause
In his fourth assignment of error, defendant contends that the trial court erred in granting four challenges for cause in favor of the State because the jurors excused did not exhibit views that impaired their ability to impose the death penalty. Defendant argues that the prospective jurors at issue merely expressed reluctance in response to the State's request for a commitment to voting for a death sentence, and that the hesitation demonstrated by their answers did not violate the standards established by Witherspoon. We disagree, and find that the trial court did not err granting the State's cause challenges as to these jurors.
Witherspoon dictates that a capital defendant's right to an impartial jury under the Sixth and Fourteenth Amendments prohibits the exclusion of prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon, 391 U.S. at 522-23, 88 S.Ct. 1770. A review of the record demonstrates that the trial judge did not abuse his discretion in granting the State's challenges for cause as to each of the panel members in dispute. All repeatedly voiced strong religious and moral opposition to the imposition of the death penalty despite defense counsel's attempts at rehabilitation. For this reason, we find no error on the part of the trial court in granting the State's challenge for cause.
E. African-American Jurors Were Purged from the Panel in Violation of Batson v. Kentucky.
In his fifth assignment of error, defendant avers that the trial court allowed the State to purge black jurors from the panel in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Defendant complains that the state used five out of 10 strikes to remove black jurors,[7] resulting in a jury with the racial make-up of eight white jurors, four black jurors, and one white alternate.[8]
*84 In Batson, the Supreme Court held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of that person's race. See also La.C.Cr.P. art. 795. If the defendant makes a prima facie showing of discriminatory strikes, the burden shifts to the state to offer racially-neutral explanations for the challenged members. The neutral explanation must be one which is clear, reasonable, specific, legitimate and related to the particular case at bar. State v. Collier, 553 So.2d 815, 820 (La.1989).[9] A reviewing court owes the district judge's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. Purkett v. Elem 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam) (citations omitted) (citing Hernandez v. New York, 500 U.S. 352, 364, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991)).
As noted in Footnote 9 infra, the Batson analysis is a three-part framework to be employed in evaluating an equal protection challenge to a prosecutor's use of a peremptory strike. However, the Batson Court declined "to formulate particular procedures" to prove discriminatory purpose and left the lower courts to determine the quantum of proof necessary for a defendant to establish a prima facie case. In State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, this Court held that the sole focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes and outlined several factors which could lead to the inference of discriminatory intent prohibited by Batson, which include, but are not limited to:
"a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination." See State v. Collier, 553 So.2d 815 (La.1989); State v. Thompson, 516 So.2d 349 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988), reh'g denied, 488 U.S. 976, 109 S.Ct. 517, 102 L.Ed.2d 551 (1988).
State v. Green, 655 So.2d at 287-88.
In the instant case, defendant presented a numerical analysis to demonstrate that a prima facie case of discrimination existed on the part of the prosecution. With regard to the four jurors at issue, defendant compared the number of African-Americans in the panel to the number of African-Americans that the State wished to strike and argued that the State used a disproportionate number of peremptory strikes on African-American venire-members. Even though the court did not find the defense argument supported a prima facie showing, the court permitted the State to articulate its race-neutral reasons *85 out of an abundance of caution.[10] A review of the voir dire record as a whole indicates that the State articulated race-neutral reasons for each of the four challenges raised by defendant. With regard to Patricia Brown, Charlene Arvie, and Karla Charles, the State explained that all three women expressed a profound reluctance to imposing the death penalty. Based upon the answers given during the colloquy, the trial court agreed and found no pretext in the reason given by the State for its use of peremptory strikes.
With regard to John Key, his interview revealed that sequestered jury service would be a problem for him because of lost income. Further, several members of his family had health concerns, and serious illness had stricken his mother-in-law. The State initially raised a challenge for cause based on his employment and family issues. The trial court denied the State's cause challenge, and both sides provisionally accepted Mr. Key. Subsequently, the State used a back strike to excuse Mr. Key. No pattern of racially discriminatory strikes by the State is detected, nor any abuse of discretion on behalf of the trial court in finding that the defense failed to present a prima facie case of purposeful discrimination. Thus, defendant's assignment of error is without merit.

IV.
In his fourteenth assignment of error, defendant contends that the admission of photographs from the murder scene were more prejudicial than probative, and therefore violated his right to a fair trial. We disagree, and find that the trial court's decision to admit the crime scene photographs did not violate defendant's right to a fair trial because the photographs possessed probative value, and further, the contents were not so gruesome as to overwhelm the jury and cause them to convict based on insufficient evidence.
This Court held in State v. Letulier, that even where the cause of death is not at issue, the State is entitled to the moral force of its evidence. State v. Letulier, 97-1360, (La.7/8/98), 750 So.2d 784, 795. Therefore, postmortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location, placement of wounds, as well as to provide positive identification of the victim. Id. In Letulier, the defendant stabbed an elderly man to death, robbed him of his social security income, and dumped his body in a local levee. Id. at 787. The State introduced pictures of the victim during the testimony of his daughter for identification purposes, as well as during the testimony of Det. Scott Haydel, a detective with the St. Martin Sheriff's Office, to explain the condition of the body when it was found. Id. at 795. Photographic evidence will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient evidence, or, as explained in La. C.E. art. 403, when the prejudicial effect of the photographs substantially outweighs *86 their probative value. Id. See also State v. Koon, 96-1208, (La.5/20/97); 704 So.2d 756; State v. Maxie, 93-2158, (La.4/10/95); 653 So.2d 526; State v. Martin, 93-0285, (La.10/17/94); 645 So.2d 190.
In State v. Perry, this Court affirmed defendant's conviction of five counts of first degree murder where the defendant shot both of his parents and two cousins, as well as a small child. State v. Perry, 502 So.2d 543 (La.1986). In Perry, the defendant argued that the admission of the photographs was unnecessary as the pathologist who performed the autopsies testified as to the cause of death, the location and number of gunshot wounds, the type of weapons used, and the distance from which the weapon was fired. Perry, 502 So.2d 543, 558. The victims in Perry were all shot at close range with a shot-gun and the photographs were quite graphic, however, this Court found that the trial court did not err in allowing the admission of the photographs into evidence as the photographs of the murder scenes were relevant to corroborate the testimony of the State's witnesses as to the location of the bodies, the apparent sequence in which the murders occurred, gunshot wounds sustained by the victims; as well as to impress upon the individual juror the seriousness of their task. Id. at 559. Therefore, we found that the admission of "gruesome photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect." Id.
With regard to the case at bar, defendant filed pre-trial motions to exclude gruesome photographs at the guilt phase and penalty phase of trial and offered to stipulate as to the victims' cause of death. On March 22, 1999, the trial court held a hearing to consider the admissibility of the state's crime scene photos. At that hearing, the State disclosed 63 crime scene photos from which it had culled 13 photos which it sought to introduce during the guilt phase. Of those, the court ruled that 10 crime scene photos would be admissible, but the other three were excluded.
There is no dispute that the scene in the small living room at 10 Guy Peart Road on May 28, 1996 was disturbing. Four family members had been shot in the head and left lying on the floor in pools of their own blood. The sight of a 10-month old baby in that setting made the scene even more shocking, however, the photographs were nevertheless relevant. The State was entitled to demonstrate that the victims clearly posed no threat to their killer, and that the head wounds suggested an execution-style killing from which none of the victims were given the opportunity to defend themselves or escape. Moreover, the 10 photographs that the trial court approved were not so graphic as to result in undue prejudice to the defendant. Nothing in the crime scene photographs admitted is so gruesome as to have overwhelmed the reason of the jury and lead them to convict without sufficient other evidence. Defendant's assignment of error as to admissibility of the photographs of the crime scene is therefore without merit.

V.
In his twenty-fourth and final assignment of error, defendant urges this Court to conduct a proportionality review to consider whether his death sentence is excessive considering that this was his "first serious offense." We disagree, and find that a quadruple homicide is a crime of sufficient heinousness to warrant the imposition of a death sentence. Further, this assignment of error addresses issues discussed in the "Capital Sentence Review" required of every death sentence.
*87 Article 1, § 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La. C. Cr. P. art. 905.9 provides that this Court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La. Sup.Ct. R. 28, § 1, which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
In the instant case, the district judge filed the Uniform Capital Sentence Report ("UCSR") required by La.S.Ct.R. 28 § 3(a), and the Department of Public Safety and Correction submitted a Capital Sentence Investigation Report ("CSIR") required by La.S.Ct.R. 28 § 3(b). In addition, the State filed a Capital Sentence Review Memorandum. These documents indicate that defendant is a Caucasian male born on July 4, 1968 to the marital union of Nelma Daigle Robinson and Leo Robinson. The defendant was twenty-seven years old at the time of the instant homicides.
Darrell's father, Leo, drank excessively and, as a result, abused his family; however, at trial his mother Nelma testified that she and Leo are still together. According to the CSIR, defendant never married, but apparently had a girlfriend at some point who bore his child, although there is no record of defendant supporting the child.
Defendant was baptized in the Catholic faith and educated in Catholic schools in Crowley, Louisiana, including St. Michael's Elementary School. He graduated from Notre Dame High School. According to the UCSR, Defendant has an IQ of above 100, which is considered "high." However, he made poor grades on his high school report cards. A friend of defendant's from his Army days described him as "incredibly intelligent."
After high school, defendant enlisted in the United States Army Airborne, and was trained as a paratrooper at Fort Benning, Georgia. Later, defendant was stationed at Fort Bragg, North Carolina. Defendant became a sharp shooter in the Army and served from 1985-88, when he was honorably discharged from the Army. Following defendant's military service, he held several odd jobs, including mowing lawns, shampooing carpets, and floating sheetrock. At the time of the instant offense, defendant had worked out an arrangement with Billy Lambert to do bush hogging work for him on his farm in exchange for room and board.
At the penalty phase of his trial, defendant's mother recalled that when he came home from the military, his problems with alcohol began to surface, and the drinking eventually became out of control. At least twice, defendant sought help for his alcoholism and substance abuse: once, at a halfway house in Grand Coteau, and once at the V.A. Medical Center in Pineville, where he met one of his victims, Billy Lambert.
Defendant has no juvenile criminal record. His adult criminal history began in 1988 when he was arrested in Fayetteville, North Carolina for possession of a weapon of mass destruction and possession of marijuana with intent to distribute. These two *88 charges were dismissed following defendant's November 16, 1988 guilty plea in a companion case in where he was charged with exceeding the posted speed and carrying a concealed weapon. Defendant was sentenced to 30 days in Cumberland County jail, suspended, and placed on unsupervised probation for six months. In 1994 and 1995, defendant was arrested by the Crowley Sheriff's office arising from two separate incidents of driving while intoxicated. In both cases, defendant pled guilty to the charges.
At the penalty phase, the State re-introduced the testimony and evidence that comprised the guilt phase, and rested. Defendant did not testify at either the guilt phase or the penalty phase of his capital trial. The defense presented 22 witnesses at the penalty phase. Its case included defendant's mother, sister, uncle, cousin, school friends, educatorsboth nuns and lay teachers, friends defendant made during military service, co-workers, deputies from the Rapides Parish Detention Center, a prison consultant, and defendant's spiritual advisor.

PASSION, PREJUDICE, AND OTHER ARBITRARY FACTORS
The notoriety of the quadruple murders in the small community of Poland, Louisiana garnered vast pretrial publicity. For this reason, the trial court granted defendant's motion for change of venue, and a jury was selected in St. Landry Parish to try the case in Rapides Parish. See La.C.Cr.P. art. 623.1. Further, even though the defendant and four victims were all Caucasians, race became an issue during jury selection when the State argued that the defense exercised all of its peremptory challenges to exclude white males from the jury. The court overruled all of the State's objections as it did not discern a pattern of discrimination by the defense.
Likewise, the defense urged that the State exercised its peremptory challenges in a discriminatory fashion to exclude African-Americans from the jury, in violation of Batson v. Kentucky. As addressed Section III, Subpart E, even though the trial court never found a prima facie case of discrimination, the State articulated race neutral reasons on the record for all of the disputed challenges. Thus, we find that no prejudice is apparent in the jury's recommendation of death.

AGGRAVATING CIRCUMSTANCES
The State relied on two aggravating circumstances under La.C.Cr.P. art. 905.4(A) and the jury returned the verdict of death on all four counts, agreeing that both were supported by the evidence: 1) the offender knowingly created a risk of death or great bodily harm to more than one person; and 2) the victim was under the age of twelve years. As discussed previously in Section I, Subpart A regarding the sufficiency of the evidence, the aggravating circumstances relied upon by the State were fully supported by the evidence. Consequently, defendant's sentence of death is firmly grounded on the finding of these two aggravating circumstances.

PROPORTIONALITY REVIEW
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. See State v. Burrell, 561 So.2d 692, 710 (La.1990); State v. Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La.1987).
*89 This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. State v. Sonnier, 380 So.2d 1, 5 (La.1979). If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, at 7.
Since 1976, seven Rapides Parish juries (in addition to the jury in the instant case) have sentenced defendants to death.[11] The most analogous to the case at bar is State v. Roy, wherein this Court affirmed the conviction and death sentence of a defendant who stabbed his former girlfriend's ex-husband and aunt to death, and slit his ex-girlfriend and her two children's throats; the latter three victims survived. State v. Roy, 95-0638 (La.10/4/96), 681 So.2d at 1230. The same situation is present in the instant case, as both cases involved execution-style attacks on an entire family apparently motivated by revenge. A review of the other capital verdicts from Rapides Parish reveal that defendant's sentence of death is not disproportionate to the crime for which he was convicted.
Given the scarcity of comparable cases in Rapides Parish, it is appropriate for this Court to look beyond the judicial district in which the sentence was imposed and conduct the proportionality review on a state-wide basis. State v. Davis, 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-31. A state-wide review of capital cases reflects that jurors often return the death penalty when a child under the age of twelve is murdered, and when members of the same family are slain together.
This Court affirmed the first degree murder conviction and death sentence rendered by the jury in State v. Carmouche, 01-0405 (La.5/14/02), 872 So.2d 1020; reh'g granted (La.9/25/03) (case remanded to consider issue of mental retardation in light of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2244, 153 L.Ed.2d 335 (2002)). In Carmouche, the defendant killed his fifteen and two-year-old daughters, in addition to their mother, with a shotgun. Carmouche, p. 2, at 1024. The jury in Carmouche recommended the death sentence based upon their finding of two aggravating circumstances, namely, that the defendant knowingly created a risk of death or great bodily harm to more than one person, and that one of the victims was under the age of twelve years of age. Carmouche, p. 3, at 1027. The same aggravating circumstances were present in the instant case, and although defendant did not have a familial relationship with his victims, the trial testimony of David Peart reflected that Billy Lambert and defendant were close friends.
In State v. Lowenfield, this Court affirmed a Jefferson Parish jury's imposition of the death penalty where the defendant shot and killed his ex-girlfriend, her mother and step-father, her four-year-old daughter, and the child's father. State v. Lowenfield, 495 So.2d 1245 (La.1985). Although the State did not assert the fact that one of the victims was under twelve years of age as an aggravating factor, the jury did find that the defendant knowingly created a risk of death or bodily harm to more than one person. Lowenfield, 495 So.2d at 1256-57. This Court specifically pointed out in Lowenfield that "the defendant knew all of the victims ... The defendant in killing them wiped out an extended *90 family which spanned three generations." Id. at 1260. The circumstances of Lowenfield are analogous to those present in the instant case, as the instant defendant similarly killed three generations of a family with whom he was familiar.
Compared to these cases, it cannot be said that the death sentence in this case is disproportionate. The evidence fully supports the jury's determination that defendant specifically intended to, and did kill four victims, one of whom was a 10-month-old baby without the ability to testify against him at trial. Both statutory aggravating circumstances urged by the State were properly found by the jury and fully supported by the record. While the State's case against defendant was largely circumstantial, the presence of the blood of the infant victim on defendant's left shoe, as well as gunshot residue found permeating his clothes, left no doubt in the jurors' minds that the defendant murdered Billy Lambert and his family. Nothing in any of the post trial documents filed pursuant to La.S.Ct.R. 28 warrants reversal of defendant's death sentence. No reversible error is discerned at either phase of trial.
DECREE
For the reasons assigned, the defendant's convictions and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
AFFIRMED.
NOTES
[1] La. Const. Art. V. § 5(D) provides that a case is appealable to the Louisiana Supreme Court if a defendant has been convicted of a capital offense and a penalty of death has been imposed.
[2] In his thirteenth assignment of error, defendant contends that the testimony of Mr. Schwoeble regarding GSR analysis should not have been admitted, as it failed to satisfy the reliability requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93, 113 S.Ct. 2786, 2795-96, 125 L.Ed.2d 469 (1993). In State v. Foret, this Court held that where a trial court is considering the admissibility of proposed expert testimony, the trial court must first make "`a preliminary assessment' `of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue.'" State v. Foret, 628 So.2d 1116, 1122 (La.1993) (quoting Daubert, 509 U.S. at 592-93, 113 S.Ct. 2786). The trial court must also determine whether the expert is proposing to testify to (1) "scientific, technical, or other specialized knowledge" that (2) "will assist the trier of fact to understand the evidence or to determine a fact in issue." Foret, 628 So.2d 1116, 1121, (citing La. C.E. art 702). The ultimate goal of the trial court under this new standard is to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 1122 (citing Daubert, 509 U.S. at 589, 113 S.Ct. 2786).

Gunshot residue detection testing is not a new science. This Court has recognized experts in this field since 1981. See State v. Boyer, 406 So.2d 143, 146-47 (La.1981). Following Boyer, trial courts have routinely accepted gunshot residue testing as a reliable and accurate technique for determining if a person has recently discharged a firearm. Id.
In the instant case, defendant waived his right to traverse Schwoeble as to his qualifications. Before testifying as to the specific tests and analysis he conducted with regard to this case, Schwoeble testified generally about the methodology employed in gunshot residue testing. During this testimony, defendant made no effort to discredit the reliability of the testing methodology Schwoeble described. Thus, defendant's thirteenth assignment of error is without merit.
[3] In State v. Foret, this Court adopted the Daubert requirement that expert scientific testimony must rise to a threshold level of reliability in order to be admissible in evidence. State v. Foret, 628 So.2d 1116, 1122 (1993)(citing Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). One of the scientific methodologies that is challenged most in Louisiana courts is the analysis of deoxyribonucleic acid (DNA). Bobby M. Harges, An Analysis of Expert Testimony in Louisiana State Courts After State v. Foret and Independent Fire Insurance Co. v. Sunbeam Corporation., 49 Loy. L.Rev. 79, 98 (2003). In State v. Quatrevingt, 93-1644 (La.2/28/96), 670 So.2d 197, this Court applied the Daubert factors to hold that DNA profiling is sufficiently reliable to cross the admissibility threshold as long as the trial court performs its gate-keeping functions. Harges, 49 Loy. L.Rev. at 99. As a result of the Quatrevingt decision, the use of DNA evidence to establish the identity of a defendant as an offender has become well-recognized in Louisiana. Id. Further, the Louisiana Legislature legitimated the relevance and admissibility of DNA evidence by its enactment of LSA-R.S. 15:441, which states: "Evidence of deoxyribonucleic acid profiles, genetic markers of the blood, and secretor status of the saliva offered to establish the identity of the offender of any crime is relevant as proof in conformity with the Louisiana Code of Evidence."
[4] Rule 3.7 of the Louisiana Rules of Professional Conduct prohibits a lawyer from acting as an advocate at a trial in which the lawyer is likely to be a necessary witness. However, the rule specifically provides for the exception in which "[d]isqualification of the lawyer would work substantial hardship on the client." Rule 3.7(a)(3). This Court examined the potential for prejudice when an attorney assumes the dual role of witness and advocate in State v. Miller, (La. 1980), 391 So.2d 1159, 1163-64. In Miller, no error was found in the prosecuting attorney serving as a witness in order the impeach the defendant because defense counsel was present to object "frequently and diligently, at whatever seemed to be unduly disadvantageous to the defense." Id.
[5] In Witherspoon, the United States Supreme Court held that a prospective juror who would automatically vote for a life sentence is properly excluded. Witherspoon, 391 U.S. at 515, 88 S.Ct. at 1773 (see also Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)).
[6] The "substantial impairment" standard applies to reverse-Witherspoon challenges. In Morgan v. Illinois, 504 U.S. 719, 738-39, 112 S.Ct. 2222, 2234-35, 119 L.Ed.2d 492 (1992), the Supreme Court held that venire members who would automatically vote for the death penalty must be excluded for cause. The Court reasoned that any prospective juror automatically voting for death would fail to consider the evidence of aggravating and mitigating circumstances, thus violating the impartiality requirement of the Due Process Clause. Id. at 729, 112 S.Ct. 2222. The Morgan Court adopted the standard enunciated in Wainwright v. Witt for determining if a pro-death juror should be excused for cause. Id. at 728, 112 S.Ct. 2222 (citing Wainwright v. Witt, 469 U.S. at 424, 105 S.Ct. 844).
[7] The state's peremptory challenges and the prospective juror's race and gender are listed as follows: Mary Gail Lamonte (WF); Melissa Joyce (WF); Melvin Charlot (BM); Clay Jackson, Jr. (WM); Jacqueline Blanchard (WF); John Key (BM); Karla Charles (BF); Charlene Arvie (BF); Patricia Brown (BF); Judie Fontenot (WF); and alternate strike Richard Randolph (BM).
[8] Appellate counsel lists the jurors with their race and gender designated as follows: Barbara Fontenot (WF); Gloria Auzenne (BF); Erin Gaines Brown (WF); Racelia Kay Dauterive (WF); Eve Doucet (WF); Timothy Carron (BM), Erma Charles (BF); Judith Ventre (WF); Leona Stoot (BF); Betty Ann Lavergne (WF); Satla Ann Venable (WF); Eric Soileau (WM); alternate juror Andrea Knott (WF).
[9] If a race-neutral explanation is tendered, the trial court must decide, in step three of the Batson analysis, whether the defendant has proven purposeful discrimination. Purkett, 514 U.S. at 765, 115 S.Ct. 1769. The Batson explanation need not be persuasive, and unless discriminatory intent is inherent in the explanation, the reason offered will be accepted as race-neutral. Id. at 767-68, 115 S.Ct. 1769. The ultimate burden of persuasion remains on the party raising the challenge to prove purposeful discrimination. Id. (citing Hernandez, 500 U.S. at 359, 111 S.Ct. 1859).
[10] The methodology adopted by the trial court in the instant case may not have strictly adhered to the steps outlined in Batson, however, its application of the analysis seems fair in light of the Supreme Court's decision in Hernandez, 500 U.S. at 359, 111 S.Ct. 1859. Hernandez held that the issue of whether the defendant has established a prima facie case becomes moot if the court requires a race-neutral reasons for excusing the prospective juror and the prosecutor responds. In this manner, the trial judge may effectively collapse the first two stages of Batson and rule on the question of discriminatory intent without deciding the question of whether the defendant established a prima facie case of purposeful discrimination.
[11] State v. Felde, 422 So.2d 370 (La.1982); State v. Moore, 432 So.2d 209 (La. 1983); State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16; State v. Eaton, 524 So.2d 1194 (La.1988); State v. Roy, 95-0638 (La.10/4/96), 681 So.2d 1230; State v. Gradley, 97-0641 (La.5/19/98), 745 So.2d 1160; and State v. Howard, 98-0064 (La.4/23/99), 751 So.2d 783.