STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

04-1555

HAROLD ALEX, JR.

VERSUS

RAYNE CONCRETE SERVICE, ET AL.

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 70,712
HONORABLE KRISTIAN EARLES, DISTRICT JUDGE
**********

**GLENN B. GREMILLION**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, John D. Saunders, and Glenn B. Gremillion, Judges.

**Cooks, Judge, concurs in part and dissents and assigns written reasons.**

**JUDGMENT VACATED AND RENDERED.**

Harold D. Register, Jr.
P. O. Box 80214
Lafayette, LA 70598-0214
(337) 981-6644
Counsel for Plaintiff/Appellant
        Harold Alex, Jr.
        Brithney Alex

Charles Martin Kreamer, Sr.
Allen & Gooch
1015 St. John Street
Lafayette, LA 70502-3768
(337) 291-1390
Counsel for Defendant/Appellee

**Employers Mutual Casualty Company**
**Rayne Concrete Service**

**Patricia J. Delpit**
**Louisiana Workers' Comp.**
**P. O. Box 98001**
**Baton Rouge, LA 70898-8001**
**(225) 231-0899**
**Counsel for Intervenor/Appellee**
**Louisiana Workers' Compensation Corp.**

GREMILLION, Judge.

The plaintiff, Harold Alex, Jr., appeals from a jury verdict finding him comparatively at fault in causing his work-related accident, its award of general and special damages, and the trial court's assessment of court costs. For the following reasons, we vacate the judgment and render as follows.

**FACTS**

Alex was employed by Louisiana Concrete Specialist (LCS), a company involved in all aspects of concrete work. In 1984, he suffered a work-related injury to his lower back while employed by a previous employer. As a result, he underwent a posterior lumbar laminotomy, with removal of the L4-5 disc and, thereafter, received a ten to fifteen percent anatomical disability. Alex remained under doctor's care until 1988. In 1989, he compromised his claim with his employer through a joint petition, in which he alleged that he was totally and permanently disabled. Approximately six months later, he returned to work, working a multitude of jobs until his employment with LCS. Prior to this accident, Alex had worked off and on for LCS for two years. At the time of the accident, he had just returned to work with LCS and was on his second day back to work.

On October 17, 1995, LCS was pouring and finishing the decking around a swimming pool being constructed by Professional Pools at a residence in Rayne, Louisiana. Rayne Concrete Service provided the concrete for the job via a truck driven by Jerry Dugas. Alex suffered an alleged work-related injury to his lower back when Dugas lowered the trough through which the concrete was poured onto his back. As a result of this incident, he filed suit against Rayne Concrete and its insurer,

1

Employers Mutual Casualty Company. The Louisiana Workers' Compensation Corporation intervened in this matter seeking to recoup indemnity and medical benefits paid as a result of Alex's work-related accident.

A jury trial was held in this matter in 1998, however, it ended in a mistrial. A second jury trial was held in December 2000. At the conclusion of that trial, the jury found both Alex and Rayne Concrete at fault in causing this accident, assessing Alex with 80% fault and Rayne Concrete with 20% fault. Alex was awarded $18,750 in general damages, $9,578 in past medical expenses, $32,523 in future medical expenses, $29,640 in past lost wages, and $33,280 in future lost wages. In response to this judgment, Alex filed a motion for judgment notwithstanding the verdict and, alternatively, for a new trial. This motion for a new trial was granted by the trial court. Rayne Concrete and Employers Mutual appealed from this judgment; however, the trial court's judgment was affirmed by this court. *Alex v. Rayne Concrete Serv.*, 01-1535 (La.App. 3 Cir. 4/3/02), 813 So.2d 1189.

A third jury trial was held in this matter from July 12-16, 2004. At the conclusion of the evidence, the jury rendered a verdict finding Alex, Rayne Concrete, and LCS at fault in causing the accident. The jury apportioned fault 45% to Alex, 50% to Rayne Concrete, and 5% to LCS. The jury further awarded Alex $40,000 in general damages, $13,000 in past medical expenses, $13,000 in future medical expenses, $10,000 in past lost wages, and nothing for future lost wages. A judgment was rendered in this matter on August 9, 2004. Alex then filed a motion for judgment notwithstanding the verdict and, alternatively, for a new trial. Upon the denial of his motion, this appeal followed.

2

## ISSUES

On appeal, Alex raises five assignments of error.[1] He argues that the trial court erred in denying his *Batson* challenge during voir dire and in allowing into evidence the June 8, 2000 medical records from Our Lady of Lourdes Hospital. He next argues that the jury erred in its assessment of fault and comparative negligence and in its award of damages, both general and special. Finally, he argues that the trial court erred in its assessment of court costs.

## *BATSON* CHALLENGE

In his first assignment of error, Alex argues that the trial court erred in denying his *Batson* challenge to Rayne Concrete's systematic exclusion of blacks from the jury, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986), and *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 111 S.Ct. 2077 (1991). Although we had previously held that a *Batson/Edmonson* challenge could only be reviewed via supervisory writs, we recently held in this matter that we would consider such challenges on appeal. *Alex v. Rayne Concrete Serv., Inc.*, 04-1555 (La.App. 3 Cir. __/__/__ ), _ So.2d _ (en banc).

The law pertaining to *Batson/Edmonson* challenges was laid out by the first circuit in *Hurts v. Woodis*, 95-2166, p. 6 (La.App. 1 Cir. 6/28/96), 676 So.2d 1166, 1172:

> A private litigant in a civil case may not use peremptory challenges to exclude jurors on the account of race. To do so is a violation of the Equal Protection Clause. *Richard [v. St. Paul Fire and Marine Ins. Co.*], 94-2112 [(La.App. 1 Cir. 6/23/95)], 657 So.2d [1087]

---

[1] In his third assignment of error, Alex argues that the trial court correctly found that Dr. Aghazadeh was an expert witness. We need not address this assignment as Rayne Concrete has failed to raise this issue in an answer to appeal.

(citing *Edmonson v. Leesville Concrete Company, Inc.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991)). First, the challenging party must make a prima facie showing that the opposing party exercised a peremptory challenge on the basis of race. The burden then shifts to the opposing party to articulate a race-neutral explanation for striking the jurors in question which is related to the case to be tried. *Batson*, 476 U.S. at 96-98, 106 S.Ct. 1723-1724. This second step of the process does not demand an explanation that is persuasive, or even plausible. *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995).

In the final step of the analysis, the trial court must determine whether the party raising the *Batson* challenge has carried his burden of proving purposeful discrimination. At this stage, the trial court must consider the persuasiveness of the explanations. It is at this stage that implausible or fantastic justifications may be found to be pretexts for purposeful discrimination. *Purkett*, 514 U.S. at [768], 115 S.Ct. at 1771.

At the beginning of the jury selection process, four blacks were selected as part of the voir dire panel: Dennis Thomas, Reve Mae Charlot, Mary Taylor, and Natalie Jordan. After the panel had been questioned, the trial court challenged Taylor for cause. Thereafter, Rayne Concrete used three of its peremptory challenges to excuse Thomas, Charlot, and Jordan. Once the jury was selected, counsel for Alex raised a *Batson* challenge by objecting to Rayne Concrete's exclusion of the three jurors based on race. He argued that Alex, who was black, had the right to a fair trial by a jury of his peers and that the exclusion of these three jurors deprived him of that right. Before the trial court determined whether Alex had made a prima facie showing of discrimination, counsel for Rayne Concrete voiced his race-neutral explanations for striking the subject jurors. Thus, the first step of the three-part step was rendered moot. *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859 (1991).

Rayne Concrete challenged all of the prospective black jurors. Taylor was challenged for cause and we find no abuse of the trial court's discretion in that

4

ruling.  Counsel for Rayne Concrete offered the following explanations for striking the remaining black jurors:

> MR. KREAMER:  Mr. Thomas indicated that he worked in the concrete business for fifteen years and had not been trained, very similar to Mr. Alex.  We don't want his particular history.  We're afraid that anything that he might think about what Mr. Alex went through being what the standard is in the industry, and he might not listen to what is going to (sic) on; as opposed to the other guy, Mr. Kershaw, who was also in the industry.  He was trained, and he knows the standards that are going to be consistent with the particular rules that are going to be testified to by Dennis Howard, the concrete liability expert.

> Ms. Charlot:  She and I just didn't get revised.  I was looking at her, and she just looked like she didn't like me, and I think she liked Mr. Alex.  And that's just based on my personal observations, and that was just kind of a gut feeling.

> Ms. Jordan:  There were many reasons.  We thought she was very close to being a challenge for cause, and we did make a for cause challenge against her.  She obviously wasn't going to be able to focus on the evidence.  And she also answered some of my general questions in ways which I think would make her more favorable to the plaintiff than the defendant.

In response to these explanations, the trial court first stated that it did not believe that *Batson* applied in a civil context.  However, it went on to find that Rayne Concrete had asserted race-neutral reasons in the use of its peremptory challenges.

> In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.  A court addressing this issue must keep in mind the fundamental principle that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact . . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.s. 252, 264-265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); see also, *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed. 2d 597 (1976).  "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected . . . a particular course of action at least in

5

part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (footnote and citation omitted); see also *McCleskey v. Kemp*, 481 U.S. 279, 297-299, 107 S.Ct. 1756, 1769-1770, 95 L.Ed.2d 262 (1987).

A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

*Id.* at 359-60, 1866.

A reviewing court owes the district judge's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. *Purkett v. [Elam]*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam) (citations omitted) (citing *Hernandez v. New York*, 500 U.S. 352, 364, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991)).

*State v. Robinson*, 02-1869, p. 26 (La. 4/14/04), 874 So.2d 66, 84, *cert. denied*, _ U.S. _, 125 S.Ct. 658 (2004).

A review of the voir dire transcript reveals that Rayne Concrete presented plausible, if not persuasive, reasons for using its peremptory challenges against Thomas, who was previously employed in the concrete industry, and Jordan, who stated that she would be unable to concentrate during the trial due to concern for her children. With regard to Charlot, counsel for Rayne Concrete based his peremptory challenge on his observations of her during the voir dire process. He did not think she liked him but liked Alex.

Therefore, it is the challenge of Charlot which is suspect. During voir dire, Alex questioned her as follows:

Mr. Register: . . . Ms. Charlot, how are you doing?

Prospective Juror Charlot: All right.

6

Mr. Register:       That's good.  Can you think of any reason that you don't want to serve?

Prospective Juror Charlot:       None whatsoever.

Mr. Register:       You're ready to go, huh?  All right.  I like that attitude!  Okay, great.  Thank you so much.

            . . . .

Mr. Register:       . . . And, Ms. Charlot, how do you feel about [awarding money for past and future pain and suffering.]

Prospective Juror Charlot:       If the Judge awards it, I think he should be compensated for it.

Mr. Register:       You're the judge.  You're going to be the judge to determine whether or not he should be given money for his past medical expenses, for his past main and suffering, and perhaps for his future pain and suffering.  If the law instructs you to do that, would you be able to do that.?

Prospective Juror Charlot:       Well, yeah, with good reason.

Mr. Register:       Okay, so as long as I prove my case up?

Prospective Juror Charlot:       Yeah.

Rayne Concrete failed to ask Carlot any questions.

We recognize that impressions drawn by the parties play an important part in their decisions on whether to challenge a prospective juror.  Further, we acknowledge that the trial court is in a far superior position to evaluate the prospective juror vis a vis a parties' challenge, together with impressions drawn from body language and demeanor.  However, it seems that to allow a challenge of a protected class of prospective jurors based on an impression garnered from little or no questioning or other statements or argument made by counsel eviscerates the intent of the *Batson/Edmonson* rule.  Accordingly, counsel's impressions which led to his

7

peremptory challenge of Charlot, although arguably race-neutral, were not sufficient to meet the standard set by *Batson/Edmonson*. Thus, we find that trial court committed legal error.

As this legal error deprived Alex of a jury of his peers, we are constrained to vacate the judgment of the trial court and set it aside. We are cognizant of the fact that this is the third jury trial of this matter and recognize the loss of judicial time and assets in the past and possibly in the future. For that reason and because the record of the trial before us is complete, so we shall conduct a de novo review and render a decision accordingly.

## MEDICAL RECORDS

In his second assignment of error, Alex argues that the trial court erred in allowing into evidence the June 8, 2000 medical records from Our Lady of Lourdes Hospital Emergency Room. He argues that the records, which reflect that he was taken to the emergency room after a fight and state that he was intoxicated, he urinated on himself, and made inappropriate comments about "white" people, was highly prejudicial towards him.

The trial court allowed the medical records into evidence finding that although they were somewhat prejudicial, their relevance outweighed their prejudicial value. A trial court is afforded great discretion in the admission of evidence during a trial. Its decision to admit or deny evidence will not be reversed on appeal in the absence of an abuse of that discretion. *Medine v. Roniger*, 03-3436 (La. 7/2/04), 879 So.2d 706. After review, we find no abuse of discretion in the trial court's admission of the medical records into evidence. Although this incident occurred approximately

8

five years after the accident at issue, we find the records relevant since Alex was admitted to the emergency room complaining of neck and back pain and because he failed to relate this incident when questioned during his deposition concerning any other incidents which might be the cause of his back condition. We find no error in admitting the hospital records into evidence.

## COMPARATIVE FAULT

In his third assignment of error, Alex claims that it was error for him to be found 45% comparatively at fault in causing his injury. He argues that his injuries were solely the fault of the truck driver, Dugas, who lowered the trough down onto his back; thus, Rayne Concrete should bear 100% of the fault.

> In an action for injury or loss, the trier of fact shall determine the degree or percentage of fault of all persons found to have contributed or caused that injury or loss. La.Civ.Code art. 2323. When apportioning fault, the factfinder should consider the five factors enunciated in *Watson [v. State Farm Fire and Casualty Insurance Co.*, 469 So.2d 967]*, which include: "(1) whether the conduct resulted from inadvertence or involved an awareness of danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought." *Watson*, 469 So.2d at 974.

*Roberts v. Robicheaux*, 04-1405, pp. 2-3 (La.App. 3 Cir. 3/2/05), 896 So.2d 1232, 1234.

Although LCS controlled where, when, and how much concrete was poured, the mixing and actual pouring of the concrete was controlled by Dugas through the trough located at the rear of the truck. To pour the concrete, the trough was lowered by Dugas via controls located at the left, rear of the truck. LCS's employees would then direct the concrete to the desired location by moving the

9

trough. The trough swivelled to either side unless locked into place by Dugas. Once sufficient concrete was poured, Dugas would lock the trough and raise it while awaiting further instructions to pour.

At the time of the accident, Alex was floating the penultimate section of decking around the pool. After they had poured sufficient concrete for this section, he testified that he thought that either he or Joseph Mamou, Jr. pushed the trough to his right. He then begin straight edging the concrete, while Mamou Jr. went to his truck to get a tool. Alex stated that he then began floating the concrete with a wooden float, which required him to bend over in order to pull the wooden float across the surface of the concrete. While bent over, he stated that he heard Mamou Jr. yell, "Pick it up, pick it up." At the same time, he felt the trough on his back pushing him down towards the concrete. He was forced down onto his hands and knees, with his face approximately two inches from the concrete, before the trough was finally lifted up.

Alex testified that he was backing away from the truck when the accident occurred. He stated that he had no idea how the trough could have ended up on top of him, but that the only way it could have moved was for Dugas to move it via his controls. Alex stated that it was the responsibility of Dugas to keep the trough to the side until more concrete was needed. He testified that neither he nor Mamou Jr. asked Dugas to pour more concrete as they were not finished with the section they were working on. He stated that he was looking down while floating the concrete and that the presence of the trough caught him off guard. He testified that there was nothing blocking Dugas' view of him while he was working. He further acknowledged that it was a rule that a worker should never work under the trough.

10

Joseph Mamou, Sr., the owner of LCS, testified that Dugas was at fault in causing this accident since he controlled the trough. He stated that they were almost finished with the job when he heard someone shout, which caused him to look towards Alex. At that point, he stated that he saw the trough being lowered onto Alex's back. In a 1996 statement and in his 1998 trial testimony, he stated that his son told Dugas to raise the trough, at which time Dugas lowered it instead. Mamou Sr. testified that Alex was smooth-edging the concrete at the time of the accident. He stated that this requires a worker to look down at the cement while backing toward the concrete truck. He said that the worker would not have time to look around while performing this task, nor would he expect the trough to come down upon him.

Mamou Jr. testified that they had just finished pouring the next to last section of concrete and that Alex was leveling the concrete just poured. He did not recall where his father was working at this point. He stated that he went to his truck to get a tool and was returning to the area when he saw Alex bent over the concrete with the trough being lowered down onto him. He testified that he yelled at Dugas several times to raise the trough before it was lifted off of Alex. Although he could not see Dugas, Mamou Jr. stated that Dugas had a clear view of Alex, who was working approximately twelve feet from the rear of the concrete truck.

Mamou Jr. testified that he did not recall asking Dugas to raise the trough prior to the accident; he stated that the trough was already raised. He further stated that he could think of no reason why Alex would have requested the trough be lowered. He stated that normally a worker performing this kind of work works backwards toward the concrete truck, with his head down concentrating on the

11

concrete.

Mamou Jr. felt that Dugas was solely at fault in causing this accident. Although he stated in his deposition that Alex and his father might share some of the fault, upon further reflection he felt that only Dugas was at fault because he had ultimate control over the trough. From his vantage point, he testified that there was no way Alex could have known that the trough was being lowered onto him and there was nothing he could have done to avoid the accident. In a January 1996 statement, he said that either Dugas or the truck was at fault in causing the accident. Mamou Jr. admitted that working under the trough is commonly known to be dangerous; however, he stated that concrete workers normally did so.

Dugas' testimony totally contradicted his previous trial testimony and statements he made in a 1996 statement. In his 1996 statement, he stated that he was told by LCS' foreman to lift the trough so that workers could work on the concrete underneath it. He testified that when he pulled the lever to raise it, the trough collapsed downward, hitting Alex. He stated that the trough together with the concrete weighed approximately eighty-five to a hundred pounds and that the trough by itself weighed forty-five pounds.

During the 1998 trial, Dugas, when asked if his hand accidently hit the down button when he tried to lift the trough, testified, "a little bit." He further agreed that had he not accidently hit the down button, the accident would not have occurred. Dugas stated that there was nothing wrong with the device which controlled the trough on the day of the accident. He further stated that at the time of the accident, Alex was straight-edging the concrete.

12

During the present trial, Dugas testified that Alex was holding a wheelbarrow into which he was pouring the concrete at the time of the accident. He stated that he lowered the trough upon Alex's command and, when he did so, the trough went down fast and hit Alex in the back of the head or the neck, knocking him down. He denied hitting the wrong button and stated that the trough might have fallen because the truck was old and because the hydraulic fluid was leaking.

Dr. Fereydoun Aghazadeh testified on behalf of Alex as an expert in industrial safety. He placed the entire blame for the accident on Dugas, stating that only he could have prevented the accident as he controlled the trough through the controls located at the rear of the truck. Although he admitted that it was not safe to work under the trough, he stated that workers worked in close proximity to it all the time. Dr. Aghazadeh further testified that it was not Alex's duty to watch where the trough was at all times, as his job required him to concentrate downward on the concrete. However, he did admit that an employer has a duty to ensure that his employees were provided a safe workplace.

Rayne Concrete presented contrasting testimony from its own industrial safety expert, Dennis Howard. Howard stated that it was unsafe for a worker to work underneath a trough or to work with his back towards the trough while in close proximity to it. He testified that a trough only presented a danger when a worker placed himself in the position to be struck by its movement. Howard further stated that it was inappropriate, unprofessional, and unsafe for a worker to focus all of his attention on his work, thus, forgetting where the trough is, if working near it. He stated that it is the responsibility of the worker to know what he is doing and to

13

conduct himself in a reasonably safe manner. He explained that Alex could have avoided the accident by requesting Dugas to move the truck back.

Howard testified that LCS is responsible for assuring that its crew is working in a reasonably safe manner and that its employees know the right way to perform and that they consistently do so. He stated that Mamou Sr. could have avoided this accident by telling Alex to move out from under the trough or by having Dugas move the truck further back. He stated that although it was an unsafe practice for Dugas to press the wrong button, his doing so should not have created a danger since no one is supposed to work under the trough. Howard finished up by stating that he did not feel that the trough lowered due to a failure of the truck's hydraulics, rather, he felt that Dugas hit the wrong button. He admitted that Dugas owed a certain responsibility of safety to Alex.

After reviewing the evidence, we find that overwhelming evidence was presented indicating that the majority of the fault rested with Dugas. Only he could lower the trough via the controls located at the rear of the truck. Both Alex and Mamou Jr. testified that the trough was raised and out of their way when they started floating the section they were working on. Furthermore, in Dugas' prior trial testimony, he admitted to hitting the wrong button, which caused the trough to lower, and that the accident would not have occurred but for his action. Thus, we apportion Rayne Concrete with 80% fault and Alex with 20% fault. Accordingly, judgement is rendered apportioning fault in the afore stated percentages.

## DAMAGES

In *Wainwright v. Fontenot*, 00-0492, pp. 5-6 (La. 10/17/00), 774 So.2d

70, 74, the supreme court explained the difference between general and special damages:

> The term "damages" refers to "pecuniary compensation, recompense, or satisfaction for an injury sustained." *Fogle v. Feazel*, 201 La. 899, 10 So.2d 695, 698 (1942). The most common type of damages in the delictual context is compensatory damages, which encompasses those damages "designed to place the plaintiff in the position in which he would have been if the tort had not been committed." Frank L. Maraist & Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 7-1 (Michie 1996) (footnotes omitted).

> Compensatory damages are further divided into the broad categories of special damages and general damages. "Special damages are those which either must be specially pled or have a 'ready market value,' i.e., the amount of the damages supposedly can be determined with relative certainty." *Id.* § 7-2 (footnotes omitted). Included under the heading of special damages are the plaintiff's medical expenses incurred as a result of the tort. 1 DAMAGES IN TORT ACTIONS § 3.02[2][c][i] Matthew Bender (2000). On the other hand, "[g]eneral damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty. These include pain and suffering[.]" Maraist & Galligan, *supra*, § 7-2.

*General Damages*

With regard to Alex's claim for general damages, the evidence can be divided into two differing views pertaining to the extent that Alex suffered an injury as a result of the October 17, 1995 accident. Four of the ten doctors who examined Alex found that he had suffered an injury and observed no evidence that he exaggerated his symptoms, while the remaining six doctors found evidence of symptom magnification by him during their examinations. One doctor even stated that he was malingering.

Dr. Patrick Juneau, the neurosurgeon who examined Alex in the emergency room on the date of the accident, stated that a CAT scan of the lumbar spine revealed mild bulging of the L4-5 and L5-S1 discs, with no impingement of the

15

thecal sac or the exiting nerve roots at either level. Finding this mild bulging normal in a thirty-seven year old male, Dr. Juneau felt that Alex had injured the deep muscles or ligaments in his lower back, which resulted in lower back pain and referred pain and numbness into the right leg. He saw no need for surgery.

Dr. Thomas Bertuccini, a neurosurgeon, examined Alex for a second medical opinion on October 26, 1995. Diagnosing Alex as suffering from low back strain and right lumbar radiculopathy, he felt that Alex had irritated a nerve in his lower back at the level of the spine, which was causing pain into his leg. Finding his condition unchanged after examinations on November 29, 1995 and January 8, 1996, Dr. Bertuccini referred Alex to a physiatrist for treatment of his pain. However, he felt that Alex's prognosis for recovery was guarded due to the length of time he had suffered these symptoms without any improvement. Dr. Bertuccini opined that some patients diagnosed with this condition recovered within days or weeks with good care and activity restrictions, whereas others recovered months later or never. He observed that motivated patients did much better than patients who were not motivated. He further testified that he did not see any overt evidence of symptom magnification by Alex.

Dr. David Barczyk, a chiropractor, treated Alex for approximately five months beginning on July 13, 1998, at which time he complained of neck, mid-back, lower back and lower extremity pain. Noting objective symptoms of decreased range of motion in the cervical and lumbar spines, spasms in the lumbar spine, and fixation or locking of the ligamentous structures, Dr. Barczyk diagnosed Alex with chronic soft tissue damage to the ligaments which hold the spinal joints together. He felt that

16

Alex's condition was a result of his October 17, 1995 accident based on how he presented and because he related the amount of dysfunction in Alex's spinal column to frank trauma. Dr. Barczyk found no evidence of symptom magnification because he felt that Alex wanted to return to work. However, he testified that Alex could not return to the heavy duty work he was performing prior to his injury.

Dr. Kenneth Adatto, an orthopaedic surgeon, treated Alex from 1984 through 1988, for a prior work-related injury, which culminated in a posterior lumbar diskectomy at the L4-5 disc level. Following this procedure, Dr. Adatto restricted Alex from repetitive stooping, bending, and the lifting of objects greater than twenty-five to fifty pounds, and restricted him from locking his back into one position without moving around approximately every forty-five minutes. He further rated Alex as having a ten to fifteen percent disability of the lumbar spine. At the time of his last examination in 1988, Dr. Adatto warned Alex that he might require further surgery to his lower back if he was unable to live with his pain.

Dr. Adatto next examined Alex on June 7, 1999. At that time, he felt that Alex had suffered an aggravation of his preexisting condition, as a result of the October 17, 1995 accident. A diskogram revealed that his L4-5 and L5-S1 discs were abnormal; thus, he performed an anterior lumbar fusion at those levels in 2001. This was the same surgery recommended in 1988. Dr. Adatto testified that both his disability rating and the restrictions placed on him were the same as in 1984. He stated that Alex's pain had lessened as a result of the surgery, but that he would always suffer pain and discomfort in his lower back. He categorized Alex as a chronic pain patient, as his pain had lasted longer than six months, and stated that he was still

permanently disabled, as he had been since 1984. He recommended that Alex undergo vocational rehabilitation for a possible return to employment, but if this failed, he should be placed on disability.

Dr. Adatto denied observing any evidence of symptom magnification by Alex. He stated that Alex's symptoms were compatible with his complaints and that he stood to gain nothing from the surgery, other than improving, as his disability rating remained the same with or without the surgery. He further testified that he was not informed of the June 8, 2000 incident, but stated that unless the incident had resulted in further injury to Alex's back, this knowledge was unessential to him.

The following doctors reported signs of symptom magnification by Alex. Dr. Robert White, a physiatrist, performed an independent medical examination of Alex on July 16, 1995. He felt that Alex suffered a contusion to the back nine months previously, with complaints of cervical and lumbar pain, but no complaints of radicular pain. He stated that an EMG study was negative in Alex's four extremities. Dr. White felt that Alex's pain was musculoligamentous in nature, rather than neurological. In his report, he stated that Alex's examination was accompanied by very marked pain behavior, obvious pain faces, and inconsistencies in testing, which might indicate an attempt by him to influence the outcome of the examination. Dr. White stated that this behavior was strongly indicative of symptom magnification.

Dr. White testified that he examined Alex again on January 17, 1996. At that time, his impression was that Alex had suffered a contusion of the spine with cervical sprain, thoracic sprain, and lumbosacral sprain associated with spasms of the paraspinal muscle. He indicated that carpal tunnel syndrome should be ruled out

18

bilaterally versus cervical radiculopathy. When asked if he had followed his previously prescribed therapies, Dr. White stated that Alex told him that he had hired an attorney on advice from a friend and, at that time, his attorney advised him to ignore Dr. White's advice and, instead, sent him to Dr. Nickerson.

Dr. Gerald Nickerson, a physiatrist, treated Alex from January 31, 1996 through June 22, 1998. He stated that he diagnosed Alex as suffering from mechanical neck and back pain, as well as myofascial pain syndrome even though he found no objective sign of injury. He testified that treatment of Alex's symptoms with medication, trigger point injections, and traditional physical therapy failed to alleviate his symptoms. Dr. Nickerson stated that physical therapy failed due to Alex's complaints of pain in performing any task. A functional capacity evaluation (FCE), performed on September 27, 1996, indicated that Alex had an equivocal validity profile indicating a partial submaximal effort, thus, the results were considered equivocal. Although he felt that Alex should enter a chronic pain program and a multi-disciplinary evaluation reached the same conclusion, he was never admitted.

Dr. Nickerson ordered a second FCE to determine Alex's work capacity in 1998. However, Alex completed only three hours of the evaluation due to complaints of pain. He stated that it was further rendered invalid since he passed only nineteen percent of the validity criteria, suggesting "a very poor or voluntary submaximal effort not necessarily related to pain, impairment, or disability." Alex further failed to demonstrate an ability to consistently lift ten or more pounds. Thereafter, Dr. Nickerson testified that he had nothing further to offer Alex with regard to his musculoskeletal pain. He opined that Alex had reached maximum

medical improvement by June 15, 1998, and recommended that he be discharged and returned to work at light duty with a rapid progression to his previous level of duty. He further felt that Alex had magnified his symptoms based on the results of the FCE, the entire general picture in terms of his progress or lack thereof, and on a psychological evaluation performed by Dr. Jimmie Cole, which suggested this finding. Accordingly, he stated that Alex was not a candidate for a chronic pain program due to his lack of motivation.

Dr. Gregory Gidman, an orthopaedic specialist, performed a second medical opinion of Alex on November 20, 1996. He stated that a CAT scan of Alex's lumbar spine revealed a mild diffuse bulge at L3-4, a moderate diffuse bulge at L4-5, and a small focal disc protrusion, minimally eccentric to the left at L5-S1, with no evidence of nerve root compression. Dr. Gidman described these as being very mild disc bulges, which he stated were common in 52% of the normal population. An EMG nerve conduction study of the upper and lower extremities were normal, as were CAT scans of his cervical spine and pelvis. Dr. Gidman noted that Alex exhibited five out of five Waddell signs in his physical examination.[2] These signs were complaints of pain with light palpation of the skin on the lower back, trunk rotation, and axial loading (lightly pushing down on the head while the patient is standing); inconsistent straight leg raising; and a nonanatomic sensory loss of the lower extremity. Dr. Gidman further noted a positive Waddell sign in Alex's facial expressions, mannerisms, and verbalization during the examination.

---

[2] Dr. Gidman described Waddell signs as being indicative of psychosocial problems involved in a patient's subjective complaints of pain. These are maneuvers which have no anatomic basis for pain. If a maneuver elicits pain from the patient, then it is a positive Waddell sign.

20

During a functional disability evaluation (FDE), Dr. Gidman felt that Alex demonstrated multiple inconsistencies and inappropriate responses on isometric dynamic lifting, grip strengths, and psychological screening tests. Although Alex performed a 22.2 pound one time lift and an 11 pound repetitive lift, Dr. Gidman stated that he failed to give maximum effort in multiple areas of testing; thus, failing the validity testing. As a result, he could not base Alex's work limitations on the FDE due to his failure to give appropriate responses.

At the conclusion of his physical exam and the FDE, Dr. Gidman concluded that there was strong evidence of psychosocial factors involved in Alex's subjective complaints of pain. He found no objective evidence of radiculopathy and none of the diagnostic exams demonstrated any pathology to explain his symptoms. As he had been treated for a year based solely on subjective complaints, with no relief of his symptoms, Dr. Gidman did not feel that Alex would benefit from either a work hardening or a chronic pain management program. Rather, he felt that Alex would benefit most from psychological testing.

Dr. Fabian Lugo, a neurologist, performed a second opinion for workers' compensation on Alex on November 19, 1997. He felt that Alex had a history of a lumbar back contusion with associated complaints of pain. He stated that his examination and a review of diagnostic tests failed to reveal any objective findings to support the intensity of Alex's complaints. He found no need for surgery. Dr. Lugo further noted the possibility that Alex was magnifying his subjective symptoms and that psychological factors might be playing a major role in his complaints. He recommended a psychological evaluation and possibly psychiatric intervention for

21

Alex to investigate the need for psychological treatment.

Dr. Jimmie Cole, a clinical psychologist, evaluated Alex upon Dr. Nickerson's recommendation, on February 23, 1998. During the evaluation, Alex related to Dr. Cole that everything upset him. He reported that he was going through a divorce and that he was drinking three to four times per week, which caused problems with his ability to deal with his anger and frustration. Dr. Cole further testified that Alex exhibited pain behavior during the evaluation by moving around, standing up, and showing obvious signs of physical pain, as in grimacing.

Dr. Cole administered several tests to Alex: the Minnesota Multiphasic Personality Inventory (MMPI), the Multidimensional Pain Inventory (MPI), and the Beck Depression Inventory. Dr. Cole testified that the results from these tests were inconsistent; thus, he had a very hard time determining what was going on with Alex and how he was dealing with his pain. He stated that the MMPI was rendered invalid due to Alex's answers on a significant number of questions which indicated that he was exaggerating his problems. He further testified that the depression scale on this test was very high. In the MPI, Dr. Cole stated that Alex indicated that his pain was very severe and was interfering with his life, but also stated that effective distress (depression or anxiety-related pain) was not significant. In the Beck Depression Inventory, Dr. Cole stated that Alex's score of forty-five appeared to be exaggerated as a score of twenty-four or twenty-five indicated significant depression.

At the conclusion of his evaluation, Dr. Cole felt that Alex was not a candidate for a coping skills program due to his inconsistencies and his problems with alcohol. He opined that Alex was exaggerating or emphasizing his physical problems

22

as he was unable to deal with his marital problems. He further felt that Alex needed to obtain help for his marital and drinking problems before he would be able to help him.

Dr. Stanley Foster, an orthopedic surgeon, performed a physical examination of Alex and reviewed his medical records at the request of Rayne Concrete. He issued a report on his findings on June 17, 2004. In testifying, Dr. Foster stated that he was familiar with the term, "symptom magnification, as found in the *Orthopedic Knowledge Update, Spine II*, published by the American Academy of Orthopedic Surgeons:

> During the history and physical examination the physician will often discover facts or signs that are incongruous with the patient's subjective complaints or history. When multiple incongruities are uncovered, the physician may become skeptical of the patient's motives and veracity. It is always difficult to objectify these intuitive misgivings.
> . . .

Dr. Foster further explained that Waddell's signs are "benign maneuvers that simulate provocative maneuvers, and they seem like they should cause pain, but they should not." He stated that the four tests are: skin roll, twist, head compression, and flip test (sitting straight leg raise).

Dr. Foster testified that he noted numerous Waddell's signs during his examination of Alex. In his examination of the cervical spine, he stated that Alex grimaced or moaned upon light palpation of the cervical spine down to the inferior angle of the scapula, and his legs buckled when he lightly pushed on the cervical area. In his examination of the lumbar spine, Dr. Foster stated that Alex would bend his knees and reach around to his back when he palpated that area; he complained of pain on hip rotation, even though this maneuver utilized the lower extremities, rather than

23

the spine; and the sitting straight leg raise test was inconsistent with the supine straight leg raise test.

Dr. Foster noted other inconsistencies in his examination, which he stated were signs of symptom magnification by Alex. When requested to, he stated that Alex could not laterally bend, rotate, or extend his head due to pain, despite being able to do so while giving Dr. Foster his history. He stated that Alex put forth little effort in shoulder girdle biceps, wrist extensor, and flexor strength, even though no evidence of muscle atrophy was noted. When asked to flex forward, Dr. Foster stated that Alex would go into a squatting position and then stand up. He testified that Alex would not attempt any extension and attempted very little lateral bending due to complaints of pain. Although Alex would not allow him to perform a supine straight leg raising test, Dr. Foster stated that he allowed him to bring his left and right leg up and extend them to forty-five degrees when testing the range of motion of his hips. Thus, he testified that Alex's supine straight leg raising test should have been positive at forty-five degrees. He further stated that there was no obvious atrophy of the lower extremities.

Dr. Foster further agreed with the definition of malingering, from the *Diagnostic and Statistical Manual of Mental Disorders*: "The essential feature of malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation." He further agreed that the four elements of malingering are: (1) media-legal context or presentation; (2) marked discrepancy between the person's claimed stress or disability and the objective findings, (3) lack of cooperation during the diagnostic evaluation and noncompliance

24

with the prescribed treatment regimen, and (4) the presence of antisocial personality disorder.

After reviewing Alex's medical records, Dr. Foster opined that Alex had been malingering up until he was seen by him and that he had been exaggerating his symptoms since 1996. He stated that the records of Drs. White and Lugo both noted evidence of symptom magnification, that Alex failed to put forth maximal effort during his 1996 and 1998 FCEs, and that Dr. Nickerson discharged him from his care in part because of his failure to try during the 1998 FCE.

Dr. Foster further opined that the surgery performed by Dr. Adatto in 2001, was unrelated to Alex's 1995 accident. He stated that Alex had already had surgery at L4-5, where the disc was taken out and degenerative changes were occurring. He then herniated another disc at L5-S1, for which surgery was recommended. Thus, he would have required surgery over his lifetime due to his worsening back condition. He further felt that surgery was not indicated for Alex's neck as the changes there were degenerative in nature. Dr. Foster did admit that according to his history, the October 17, 1995 accident aggravated Alex's preexisting condition and that he knew of no other factor which could have caused this aggravation. He further agreed with Dr. Adatto's recommendation that Alex should undergo vocational rehabilitation training.

Based on his findings, Dr. Foster felt that Alex, if motivated, could return to work at a light to medium duty level; that he could have returned to work in 1996. He stated that light to medium duty involved no repetitive lifting of over twenty pounds, no lifting of over thirty to forty pounds, occasionally, and the ability to sit,

25

stand, walk, or move as needed.

Alex testified that he suffered a previous work-related injury to his lower back in 1984, when a bundle of boards pinned him to the back of a truck. After Dr. Adatto performed surgery on his back, he stated that his recovery time was one and one-half years. Although Dr. Adatto recommended a second surgery, he testified that he refused the surgery and tried to rehabilitate himself. Alex testified that he settled his workers' compensation case and that Dr. Adatto released him to return to light duty work. He stated that he then returned to work and that he experienced no problems with his lower back until the present accident.

After his October 17, 1995 accident, Alex stated that he experienced neck and back pain and that he was taken and treated at the Lafayette General Medical Center Emergency Room. He stated that Dr. Juneau treated him with a shot and medication and told him not to return to work. He returned to Dr. Juneau one other time, after which he was treated by several different doctors in several different specialties. He stated that he received some relief from his back pain from Dr. Barcyzk in 1998, until the insurance company stopped paying for his treatment.

Alex testified that he returned to Dr. Adatto in 1999, at which time both his back and neck hurt. He stated that the pain in his back was eight or nine out of ten, and his neck was five or seven out of ten. He said that Dr. Adatto performed a CAT scan and possibly an MRI on his back, after which he told him that he required immediate surgery for his lower back. He testified that the surgery was performed and that he remained hospitalized for five or six days. Following the surgery, Alex stated that his pain is about the same, but that it has not worsened. After a year and a half,

26

he testified that Dr. Adatto started treating his neck and that he has recommended surgery. He rated his pain as now being six out of ten in his back and eight or nine out of ten in his neck. He testified that Dr. Adatto has not released him to return to work yet.

Alex, who was married at the time of the accident, testified that his wife left him due to his inability to satisfy her sexually after he reinjured his back. He stated that were divorced in 1997. He described his life as being uncomfortable and depressing since the accident. He testified that he is no longer able to participate in activities such as sports, hunting, and fishing, although he has fished since then and is able to throw up a basketball. Alex stated that he stretches and rides his bike daily, as well as cooking, cleaning, and doing his own shopping. He further testified that this accident has affected his financial situation as he is prevented from getting what he wants and from doing the things he would like to do for his two children.

After reviewing the evidence, we find that although Alex had suffered a prior injury to his lower back, the October 17, 1995 accident did cause an aggravation of his previous existing condition. Therefore, we award him $75,000 in general damages.

***Special Damages***

Special damages are those damages which may be determined with some degree of certainty and include past and future medical expenses and past and future lost wages. *Wainwright*, 774 So.2d 70. The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the evidence. *Hornsby v. Bayou Jack Logging*, 03-1544 (La.App. 3 Cir. 5/5/04), 872 So.2d 1244. The award of future

27

medical expenses must be supported by medical testimony indicating both their need and probable cost. *Holliday v. United Servs. Auto. Ass'n*, 569 So.2d 143 (La.App. 1 Cir. 1990).

At the start of the trial, Alex and LWCC entered into a Stipulation as to Intervention in which they stipulated that LWCC has paid medical expenses on behalf of Alex in the amount of $111,183.33, through July 9, 2004. However, considering the overwhelming testimony that Alex began exaggerating his symptoms as early as 1996, we find that an award of $13,000 in past medical expenses is sufficient to compensate him for the aggravation of his preexisting condition. Although the record contained little evidence on the issue of future medical expenses, we find that an award of $13,000 is appropriate.

With regard to past and future lost wages, Mamou Sr. testified that Alex earned seven dollars per hour while employed by LCS. Two check stubs from LCS show that Alex earned seven dollars per hour for sixteen hours of work for gross earnings of $112 and net earnings of $93.61.[3] Alex's W-2 form from LCS for 1994 lists his wages as $1,129. Mamou Sr. further testified that Alex worked off and on for LCS; he would quit for whatever reason and then return to work at a later date.

Alex testified that he earned approximately $75-80 per day and approximately $365 per week from LCS. He stated that LCS paid him cash three weeks out of the month and then by check for the fourth week. He testified that he did not report the cash he earned to the Internal Revenue Service, but did report the income he earned by checks. Finally, he testified that concrete finishers earned

---

[3] The check stubs are dated October 14, 1995 and October 17, 1995.

approximately $150-200 per day; he further stated that he had considered starting his own concrete finishing business prior to his work-related accident.

Considering the sporadic nature of Alex's employment and the evidence introduced into the record with regard to his past earnings, we award Alex $10,000 in past lost wages, but nothing for future lost wages. Accordingly, judgment is rendered awarding Alex $13,000 in past medical expenses, $13,000 in future medical expenses, $10,000 in past lost wages, and nothing for future lost wages.

## CONCLUSION

For the forgoing reasons, the judgment of the trial court is vacated and set aside. Judgment is now ordered, adjudged, and decreed that there be judgment finding Rayne Concrete 80% at fault and apportioning 20% of the fault to Alex. We further order, adjudge, and decree that there be judgment awarding Alex $75,000 in general damages, $13,000 in past medical expenses, $13,000 in future medical expenses, $10,000 in past lost wages, and nothing for future lost wages. The costs of this appeal are assessed 80% to the defendant-appellee, Rayne Concrete Service, and 20% to the plaintiff-appellant, Harold Alex, Jr.

JUDGMENT VACATED AND RENDERED.

HAROLD ALEX, JR., ET AL.

VERSUS

RAYNE CONCRETE SERVICE, ET AL.

**COOKS, J., concurs in part and dissents.**

I concur with the majority opinion finding the trial court erred when it accepted the defense counsel's explanation for his peremptory challenge of a black juror. The majority held defense counsel's explanation was "not sufficient to meet the standard set by *Batson/Edmonson*." Moreover, the majority acknowledged the *Edmonson* violation "deprived Alex of a jury of his peers." However, despite this fact, the majority concludes the remedy for a violation of Mr. Alex's constitutional right to a fair trial is to have his case decided by a panel composed of three members of this court on a *de novo* review of a cold record. I respectfully submit this case should be remanded for a new trial.

A new trial is always the remedy in a criminal case when a Defendant has successfully shown the State purposefully excluded jurors based on race, in violation of *Batson*. *See State v. Myers*, 99-1803 (La.4/11/00), 761 So.2d 498, in which the supreme court held:

> [W]e hold the trial judge erred in not addressing defense counsel's *Batson* objections and this error raises serious federal constitutional equal protection issues affecting the rights of both the defendant and the excused venirepersons. Thus, defendant's conviction is reversed and the case remanded to the trial court for a new trial.

*Id.* at 503. *See also State v. Elie*, 2004-1610 (La.App. 1 Cir. 3/24/05), 899 So.2d 689, where the appellate court found a *Batson* violation, reversed the Defendant's conviction and remanded for a new trial.

1

The remedy should be no different in a civil case. Mr. Alex should be given the opportunity to have his complaint heard by a panel of impartial jurors. This was the remedy envisioned by the Fifth Circuit in *Edmonson v. Leesville Concrete Company, Inc.*, 943 F.2d 551 (5th Cir. 1991), in which the court, on remand from the United States Supreme Court, stated:

> We now remand the case to the district court to determine in the first instance whether or not Edmonson established a *prima facie* case of racial discrimination under the standards set forth in the Supreme Court's opinion in this case. If the district court determines that Edmonson has established such a prima facie case, then it will afford Leesville the opportunity to show that it exercised its peremptory challenges for a neutral, that is to say nonracial, reason or reasons. *If Leesville does not come forward with such a showing, the district court shall order a new trial.* Otherwise the district court shall deny Edmonson relief.

*Id.* at 552.(emphasis added.)

I respectfully submit once the jury is tainted by racial bias, the entire trial is marred and the only remedy is a new trial. As the United States Supreme Court in *Edmonson* stated:

> Race discrimination within the courtroom raises serious questions as to the fairness of the proceedings conducted there. Racial bias mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality. [citations omitted]. In the many times we have addressed the problem of racial bias in our system of justice, we have not "questioned the premise that racial discrimination in the qualification or selection of jurors offends the dignity of persons and the integrity of the courts." *Powers,* 499 U.S. at 402, 111 S.Ct. at 1366. To permit racial exclusion in this official forum compounds the racial insult inherent in judging a citizen by the color of his or her skin.
>
> . . . .
>
> If our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury. By the dispassionate analysis which is its special distinction, the law dispels fears and preconceptions respecting racial attitudes. The quiet rationality of the courtroom makes it an appropriate place to confront race-based fears or hostility by means other than the use of offensive stereotypes.

*Id*. at 628 and 630.

This case should be remanded for a new trial and Mr. Alex should be given an opportunity for a trial free of racial bias.