STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-526

STATE OF LOUISIANA

VERSUS

REOKENSKI VODISE THOMAS
AKA REOKENSKI THOMAS

**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 101974-FB
HONORABLE CHUCK R. WEST, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Elizabeth A. Pickett, D. Kent Savoie, and Van H. Kyzar, Judges.

CONVICTIONS AFFIRMED;
SENTENCES VACATED;
AND REMANDED FOR RESENTENCING.

Richard A. Spears
101 Taylor Street
New Iberia, LA 70560
(337) 367-1960
COUNSEL FOR DEFENDANT/APPELLANT:
    Reokenski Vodise Thomas
    a/k/a Reokenski Thomas

Trent Brignac
District Attorney
Timmy J. Fontenot
Marcus L. Fontenot
Nicole F. Gil
Assistant District Attorneys
Thirteenth Judicial District
P. O. Drawer 780
Ville Platte, LA 70586
(337) 363-3438
COUNSEL FOR APPELLEE:
    State of Louisiana

**KYZAR, Judge.**

The defendant, Reokenski Vodise Thomas, appeals his convictions for first degree murder, a violation of La.R.S. 14:30(A)(3), and attempted first degree murder, violations of La.R.S. 14:27 and La.R.S. 14:30(A)(3). For the reasons herein, we affirm the defendant's convictions but set aside his sentences and remand the matter for resentencing.

## DISCUSSSION OF THE RECORD

The defendant was indicted by a grand jury for the first degree murder of Joseph John, in violation of La.R.S. 14:30(A)(3), when he had the specific intent to kill or inflict great bodily harm upon more than one person, namely the victim and his brother, Derricke John, and for the attempted first degree murder of the victim's brother, in violation of La.R.S. 14:27 and 14:30(A)(3), when he had the specific intent to kill or inflict great bodily harm upon the same two persons. The State then moved to consolidate the trial of the defendant with that of the co-defendant, Hilton Wilson, who was indicted on the same day as the defendant on the same charges.

Following an eight-day jury trial, the jury returned guilty verdicts as to each defendant, finding both guilty of the first degree murder and attempted first degree murder of the victim and his brother, respectively. Thereafter, the defendant was sentenced to serve life in prison for the first degree murder conviction and twenty-five years for the attempted first degree murder conviction, with each sentence to be served without the benefit of parole, probation, or suspension of sentence and the sentences to run concurrently. [1] On appeal, the defendant raises two assignments of error: (1) The trial court erred in failing to grant a mistrial for two statements made by a witness regarding other crimes committed by the co-

---

[1] The defendant was not represented by counsel during sentencing, as will be discussed below.

defendant in contravention of La.Code Crim.P. art 770(2); and (2) Based on the evidence produced at the trial, the jurors could not reasonably have concluded that the defendant was guilty beyond a reasonable doubt.

## OPINION

### *Sufficiency of Evidence*

In his second assignment of error, the defendant asserts that the evidence presented at trial was insufficient for the jury to conclude that he was guilty of the crimes of first degree murder and attempted first degree murder beyond a reasonable doubt. Thus, we will address this assignment of error first.

> When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot.

*State v. Hearold*, 603 So.2d 731, 734 (La.1992) (footnote omitted).

In applying the sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), we also recognize the following:

> A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id.*

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86.

2

"First degree murder is the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." La.R.S. 14:30(A)(3).

> Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.Rev.Stat. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the defendant's actions and the circumstances of the transaction. *State v. Maxie*, 93-2158, (La.4/10/95), 653 So.2d 526, 532. Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill. *State v. Seals*, 684 So.2d 368, 373 (La.1996) (citing *State v. Williams*, 383 So.2d 369 (La.1980); *State v. Procell*, 365 So.2d 484 (La.1978)).

*State v. Robinson*, 02-1869, p. 8 (La. 4/14/04), 874 So.2d 66, 74, *cert. denied*, 543 U.S. 1023, 125 S.Ct. 658 (2004).

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

La.R.S. 14:27(A).

During this eight-day trial, the jury heard extensive testimony and was presented with much physical, photographic, and documentary evidence. Derricke John testified that he and his two brothers were at their home at 120 East Washington Street in Ville Platte on the night of the shooting. He stated that he and Joseph, who he referred to as "Smoke," were outside under the carport, while his other brother, Erricke, was asleep inside the home. Derricke testified that suddenly he and Joseph were being shot at as multiple gunshots rang out and that they both began to run. He stated that Joseph fell as he ran and that he began to run the other way into an alley adjacent to the house. He said that he could hear and feel the bullets fired in his direction. He further stated that shortly prior to the shooting he saw a green Ford Taurus pass in front of the house. Derricke testified

3

that after the shooting stopped he located his brother in the ally and found him bleeding from a gunshot to his abdomen. He stated that he ran into the house to wake Erricke, telling him that "Smoke" was shot. He said that he then ran to the Ville Platte Police station to report the shooting rather than call 911, stating that he thought it would be quicker since the station was only about a minute away if he hurried.

Derricke testified at trial that he was able to identify the defendant as one of the shooters, although he admitted not telling the authorities this on two other occasions. He also testified as to an incident earlier in the evening on Laran Street in Ville Platte, where the defendant fired a handgun at him and his brothers as they drove away from the location of a verbal altercation with the defendant. He was cross-examined extensively by counsel for both defendants as to these prior inconsistent statements and other potentially impeaching factors.

Erricke John, the brother of the victims, testified that he was home with his brothers at the time of the shooting. He stated that he was inside asleep at the time, but was awakened by Derricke telling him that "they" had shot Smoke. He stated that he went outside, saw his brother, and then waited until the authorities arrived. He said that he did not witness any of the events of the shooting because he was sleeping. He further testified about the Laran Street incident and stated that the defendant shot at them earlier as they pulled away in their vehicle following a verbal altercation.

Latasha Thomas testified that earlier on the night of the murder she arrived at her home on Laran Street, at approximately 7:00 p.m., and observed two vehicles partially blocking the driveway of her home. She stated that she saw Joseph John, who she also referred to as "Smoke," along with his brother Erricke. She said that she asked them to move their vehicles and they acknowledged her.

4

Ms. Thomas testified that she then saw the defendant walk out toward the street with a handgun. She stated that she asked him not to shoot because her daughter was at home, but he fired the gun anyway in the direction of the Johns' vehicle as they drove away. She said that she called the police to report the shooting and retrieved a shell casing discharged from the defendant's gun, which she gave to an officer upon his arrival.

Officer Lucas Griffen, of the Ville Platte Police Department, testified that he responded to the Laran Street shooting incident and recovered a shell casing from Ms. Thomas that she retrieved after the defendant fired it in the direction of the Johns' vehicle. That casing was later turned over to Detective Pat Hall, the lead Detective on the murder investigation.

Officer Cody Savoy, formerly of the Ville Platte Police Department, responded to the shooting on East Washington Street at approximately 11:30 p.m. and assisted with securing the crime scene He testified that he also responded to the scene of the reported 7:00 p.m. shooting incident on Laran Street. He reported that a shell casing was recovered by Officer Griffen from Ms. Thomas from that crime scene.

Officer Kyeishia Evans, of the Ville Platte Police Department, testified that she and Officer Griffen arrived at the scene on East Washington Street just after Officer Savoy. She stated that she stayed with the victim in the ally, where he was found bleeding from the gunshot wound to his abdomen. She said that he was alive but unresponsive. She stated that she held him and prayed for him until emergency medical personnel arrived to transport him to the hospital, where he later died from his wounds.

Dr. Terry Welke, a forensic pathologist, testified that he performed the autopsy on the victim and that the cause of death was a gunshot wound to the

5

abdomen. He stated that he removed a bullet fragment from the victim's fatal wound, which he thought was a nine millimeter caliber slug, and turned it over to Detective Pat Hall. He stated that he also discovered a bullet fragment in the victim's forearm, which was later identified as a .25 caliber bullet, but concluded that this was not recent or related to the victim's death.

Bernadine Arvie, who lives in the area of the shooting on East Washington Street, testified that she and Lunel Robinson were at her home on the night of the shooting and that they heard multiple gunshots outside at approximately 11:30 p.m. She stated that they went outside onto her porch and observed two persons running away from the direction of the shooting. Ms. Arvie testified that she could not identify the persons running. Mr. Lunel Robinson also testified that he saw two men running away from the scene shortly after they heard multiple shots fired. He stated that one of the men was taller than the other. However he said that he was unable to identify the men as it was dark outside.

Joshua Joseph testified that after 10:30 p.m., on the night of the shooting, he saw the defendants get out of a Green Taurus automobile in an area close to the scene of the shooting on East Washington Street. He stated that he saw the two men walk away from the vehicle and, as he walked on, he heard gunshots coming from East Washington Street. Mr. Joseph testified that when he looked in the direction of the gunfire, he saw two men shooting towards a house, and he specifically identified the defendant as one of the shooters. Although he saw both men shooting in the direction of the murder scene, he was unable to identify the other shooter.

Lashaine Semien, the former girlfriend of the co-defendant, testified that she was with the co-defendant at their home on the night of the shooting, until he left just after 10:00 p.m. She testified that when he returned he told her he had been

6

with the defendant and that he had probably shot someone he referred to as "Smoke," which was John Joseph. He told her that both he and the defendant shot at the victim.

Detective Pat Hall, of the Ville Platte Police Department, testified that he was the lead investigator on the John murder case. In processing the crime scene, he stated that he located nine shell casings from the position where the shooters fired from across the street at the victim's house, at 120 East Washington Street. He said that two bullet fragments were recovered, one from a vehicle located in the area between where the casings were found and the carport area of the victim's house and another bullet was found in the driveway. Detective Hall testified that he also collected DNA swabs from a fence, which appeared to have been touched as it was covered with dew. He stated that he thought the fence was jumped by the perpetrators while fleeing the scene. He said that he also retrieved two bullet fragments from the coroner's office, which were removed from the victim,. Detective Hall testified that Officer Griffen also gave him the shell casing from the Laran Street shooting, thinking it to be related. The casings, bullet fragments, and DNA samples, as well as reference samples from both defendants, were turned over to the Louisiana State Police (LSP) Crime Lab

Rodney Daigle, a former detective with the Ville Platte Police Department, testified that he worked the homicide the night it occurred, and he corroborated the testimony of Detective Hall, as did Connie Lamke, the secretary of the Ville Platte Police Department Investigations Division, who assisted in taking photographs of the crime scene, as directed by Detective Hall.

Cheryl Swearingen, an expert in forensic firearms analysis for the LSP Crime Lab, testified that the nine shell casings found at the crime scene were fired from the same nine millimeter firearm. She stated that one of the casings

7

recovered from the vehicle was not shot from this firearm. Ms. Swearingen testified that the casing from the earlier Laran Street shooting was fired from the same firearm as the nine casings recovered from the murder scene. The bullet fragment recovered from the vehicle located in the line of fire between the shell casings and the victim's house matched one of the fragments recovered from the body of Joseph John during the autopsy. However, the other bullet recovered from the victim's arm was fired from a .25 caliber weapon.

Paul Berry, an expert in DNA analysis with the LSP Crime Lab, testified that the DNA swabs, recovered from the fence by Detective Hall, contained a combination of DNA from two persons. However, he stated that the technology utilized by the LSP Crime Lab was not advanced enough to learn any further information, so he sent the data to a more advanced lab, Cybergenetics, for further testing.

Dr. Mark Perlin, a DNA expert and the founder of Cybergenetics, a company specializing in the computer interpretation of DNA from a statistical perspective, testified that he analyzed the DNA forwarded to him by the LSP Crime Lab. He opined that as to one of the two sources, it was 157 million times more probable to be the co-defendant's DNA than any other black male. As to the other source, he opined that it was 340 million times more probable to be the defendant's DNA than that of another random black male.

The defendant argues that the evidence presented to the jury was insufficient to support his guilty verdicts for first degree murder and attempted first degree murder. He argues that the testimony of many of the witnesses was incredulous or otherwise not believable. We disagree. Despite extensive cross-examination of virtually all of the fact witnesses, including the police officers, by counsel for both defendants, it is clear that the jury accepted the witnesses' testimony and the

8

resulting evidence in finding the defendant guilty of both crimes. It is not our role to second guess the trier of fact as to issues of credibility.

The evidence as presented established that the defendant shot at the victims multiple times as they stood in front of their home on East Washington Street. The defendant was identified by both Derricke John and Joshua Joseph as being one of two individuals firing towards the house. The defendant was also identified as having fired at the victims earlier in the evening, using the same weapon as the one used during the murder. The co-defendant's former girlfriend testified that he told her after the shootings that he and the defendant both shot at "Smoke." The DNA evidence recovered from the scene puts both defendants there around the time of the crimes. Ms. Arvie and Ms. Robinson both testified that they saw two persons running away from the scene of the shooting in this same general area shortly after the gunfire stopped.

The evidence taken as a whole clearly establishes that the defendant shot multiple times at both victims as they were under the carport of their 120 East Washington Street home; thus, establishing that he had the specific intent to kill more than one person. First degree murder, as defined in La.R.S. 14:30(3), includes "those murderers who formed an intent to commit multiple killings and who did in fact create the risk of multiple deaths through a single act or a closely related series of acts that resulted in at least one death." *State v. Williams*, 480 So.2d 721, 727 (La.1985). Further, "specific intent to kill can be inferred from someone pointing a gun at close range and pulling the trigger." *State v. Tassin*, 536 So.2d 402, 411 (La.1988), *cert. denied*, 493 U.S. 874, 110 S.Ct. 205 (1989). In addition, the State is not required to prove that the defendant actually pulled the trigger of the gun that fired the fatal shot, but only "that defendant acted in concert with his co-perpetrators, that defendant had the specific intent to kill, and that one

9

of the aggravating elements enumerated in La.Rev.Stat. 14:30 was present." *State v. Anthony*, 98-406, p. 13 (La. 4/11/00), 776 So.2d 376, 386, *cert. denied*, 531 U.S. 934, 121 S.Ct. 320 (2000).

Accordingly, we find that there was sufficient evidence, when viewed in the light most favorable to the prosecution, to conclude the defendant's guilt beyond a reasonable doubt.

### Other Crimes Evidence

In his first assignment of error, the defendant argues that the "Trial Court should have granted a mistrial when a witness mentioned two separate allegations of other crimes that the defendant committed." The statements complained of are from the testimony of Ms. Simien, co-defendant's former girlfriend. During her testimony, she made statements regarding two different alleged other crimes incidents related to the co-defendant. The other crimes incidents at issue appear in the record as follows:

BY THE STATE:

Q. Ms. Semien how many pages in that statement?

A. Eight.

Q. There's eight pages right. I'm gonna ask you to review page two or it has the words SK at the bottom. You recognize that?

A. Yes.

Q. Can you read what Mr. Krueger ask [sic] you?

A. "So Hilton Wilson told you after he got back to the house that he possibly shot somebody and that it was he and Kenski Thomas."

Q. What was your reply?

A. Yes.

Q. Later on in the statement y'all started talking about potentially another incident right on Easter do you remember that?

10

A. Yes.

. . . .

Q. Page seven is he asking you about stuff that happened on Good Friday and Easter Sunday?

A. Yes.

Q. On page eight the part that Mr. Richard showed you is that your reply to what happed on Good Friday and Easter Sunday?

A. Yes.

The State argues, and we agree, that this line of questioning referred back to previous questioning of this witness by defense counsel who first elicited the information during cross-examination, as reflected in colloquy from earlier in her testimony, as follows:

BY MR. RICHARD:

Q. Is this one of the statements that you reviewed on page page [sic] eight of nine of the statement you gave on June 18th 2014 to Agent Krueger?

A. This is something else. This is another incident.

Q. Okay. So it's another incident whenever Agent Krueger asked and from that point at some point and [sic] time he says they went back and shot at the people that were shooting at them and you said "no he didn't tell me that that's the story that was around town and he got charged for that".

A. Okay that was another incident this this [sic] not the the the [sic] murder trial. This [is] something that happened before.

Q. And that's one of the statements you reviewed prior coming [sic] here today? Did you make more than one statement on June 18th to Agent Krueger?

A. No.

Q. That's the only statement you recall making right?

A. What you just showed me that was dealing with a drive by shooting that happened on Easter Sunday.

. . . .

11

The next incident involving the co-defendant discussed by this witness appears as follows:

BY MR. FONTENOT, Attorney for State:

Q.    Ms. Semien why did you and defendant Wilson break up[,] why was the relationship ended?

A     The last time the relationship ended was because he went beat up another woman while he was driving my car and he went to jail for that. That was the last time the relationship ended.

As clearly reflected from the transcript, and as admitted by the defendant in his argument, neither of these statements involved him directly. Each of the other incidents referred to by Ms. Semien only involved the co-defendant.

In *State v. Burdgess*, 434 So.2d 1062, 1065 (La.1983) the supreme court discussed when other crimes evidence not otherwise admissible must result in a mistrial as opposed to situations where the trial court has the discretion to admonish the jury to disregard such, as follows:

Louisiana Code of Criminal Procedure Article 770 provides in part that:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

(1) Race, religion color or national original, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury:

(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

(3) The failure of the defendant to testify in his own defense; or

(4) The refusal of the judge to direct a verdict.

In other situations where prejudicial remarks are made before the jury, the trial judge may use his discretion to admonish the jury to disregard the remark rather than grant a mistrial. La.Code Crim.P. art. 771. Since mistrial is such a drastic remedy, unless mandated by article 770, it should only be used in those situations which might result in substantial prejudice to the defendant. *State v. Smith*, 430 So.2d 31; *State v. Tribbet*, 415 So.2d 182 (La.1982); *State v. Belgard*, 410 So.2d 720 (La.1982).

In this instance, the trial court denied the defendant's motion for a mistrial, concluding that the statements were not made by the State or another court official. We agree. Each of the statements complained of were the statements of the witness Ms. Semien, not statements by the State or any other court official. As such, no mandatory mistrial was warranted under the provisions of La.Code Crim.P. art. 770. The trial court further declined to order a discretionary mistrial and offered to admonish the jury to disregard any statement concerning the other incidents as provided for under La.Code Crim.P. art. 771. Counsel for each defendant declared that they did not wish for such an admonishment to be given.

We conclude that the trial court did not abuse its discretion in failing to grant a mistrial as to the defendant herein. Neither of the statements complained of involved the defendant. In *State v Davis*, 08-165, pp. 15-17 (La.App. 5 Cir. 7/29/08), 993 So.2d 295, *writs denied*, 08-2188, 08-2200 (La. 5/1/09), 6 So.3d 810, 811, the fifth circuit considered a motion for mistrial as to statements relating to a person or persons other than the defendant:

> Defendant first complains that evidence of the threats his family made against Williams at the first trial was admissible other crimes evidence. Williams explained that he refused to testify at defendant's first trial in 2005 because defendant's family scared him. Defense counsel objected, arguing that Williams' testimony suggested that defendant and his family were involved in intimidation, which was inadmissible evidence of other crimes. She also argued that she had no *Prieur* notice of those crimes.
>
> . . . .
>
> The trial judge was correct in that the prosecutor made no reference to other crimes that were committed or allegedly committed

13

by the defendant. Instead, the prosecutor's questions made reference to other crimes that were committed or allegedly committed by defendant's family. La.Code Evid. art. 404(B)(1) only prohibits evidence of other crimes or bad acts committed by a defendant. Therefore, we find that the evidence in question was admissible and, therefore, the trial court did not err by overruling defense counsel's objection to it.

. . . .

A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. *State v. Smith*, 04-340, p. 5 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, 285. Whether a mistrial should be granted is within the sound discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion. *Id.*

Further, in *State v. Prudhomme*, 532 So.2d 234, 238 (La.App. 3 Cir. 1988), *writ denied*, 541 So.2d 871 (La.1989), we refused to reverse the trial court's decision to admonish a jury to disregard a police officer's testimony regarding the alleged bad acts of one co-defendant at the trial of the other rather than grant a mistrial, reasoning as follows:

> The facts of the instant case closely resemble *State v. Prudholm*, 446 So.2d 729 (La.1984), in which case a police officer alluded to other charges against a co-defendant . . . in an unresponsive answer to a question posed by defense counsel. Defendant . . . moved for mistrial, maintaining that the reference to other charges against [the co-defendant] cast him . . . in an unfavorable light. The trial court denied the request for mistrial and admonished the jury to disregard the testimony. The Supreme Court affirmed the decision of the trial court, finding that the admonition was sufficient to assure the defendant a fair trial.

In this instance, the statements complained of were not made by or directly elicited by the State or other court official. Further, the incidents complained of were not acts of this defendant, but those of the co-defendant. Thus, the trial court correctly applied the provisions of La.Code Crim.P. art. 771, rather than La.Code Crim.P. art. 770, to these statements. Although the trial court ruled that it would indeed instruct the jury to disregard any reference to the complained of evidence,

14

each defendant waived such an admonition. As such, there was no error in the trial court's ruling.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find two errors patent.

### *Absence of Counsel at Sentencing Hearing*

The trial court minutes reflect that the defendant was unrepresented during his sentencing, and the transcript of the sentencing hearing confirms this fact. At a previous pre-sentencing conference, it was decided that an alternate attorney would stand in at sentencing for the defendant's attorney, who had a scheduling conflict. The transcript reflects that the attorney designated to appear for sentencing failed to appear and that the trial court proceeded with the sentencing without his presence. The record further reflects that the defendant did not waive his right to counsel at any time prior to his actual sentencing.

In *State v. Joseph*, 14-1188, pp. 3-4 (La.App. 3 Cir. 5/6/15), 164 So.3d 389, 391, this court addressed the error of the defendant being unrepresented during his resentencing:

> Pursuant to the Sixth Amendment of the United States Constitution, a defendant has a right to counsel at every critical stage of criminal proceedings, including a resentencing hearing. *State v. Dupas*, 94-1264 (La.App. 3 Cir. 3/6/96), 670 So.2d 667. "Unless a defendant has made a knowing and intelligent waiver of his right to counsel, any sentence imposed in the absence of counsel is invalid and must be set aside." *Id.* at 669 (quoting *State v. Flowers*, 598 So.2d 1144, 1146 (La.App. 1 Cir.1992)). In determining whether a defendant has knowingly and intelligently waived the right to counsel, a trial court must conduct "a meaningful inquiry" with the defendant regarding the waiver and must advise the defendant "of the dangers and disadvantages of self-representation." *State v. Hayes*, 95-1170, pp. 4-5 (La.App. 3 Cir. 3/6/96), 670 So.2d 683, 685-86. Alternatively, this court has found that a defendant's conduct can constitute an implied waiver of the right to counsel. *State v. Batiste*, 96-526

15

(La.App. 3 Cir. 12/11/96), 687 So.2d 499, *writ denied*, 97-174 (La.6/30/97), 696 So.2d 1003; *State v. Mitchell*, 580 So.2d 1006 (La.App. 3 Cir.1991), *writ denied*, 613 So.2d 969 (La.1993). Such conduct includes dilatory tactics by a defendant, for example, obtaining multiple continuances by refusing to accept court-appointed counsel and failing to secure other counsel. *Id.* Additionally, a criminal defendant is entitled to court-appointed counsel at each stage of the proceedings if indigent and facing charges punishable by imprisonment. La. Const. art. 1, § 13.

Thus, a defendant has a right to counsel at sentencing and resentencing, unless that right has been knowingly and intelligently waived by the defendant.

Here, the defendant appeared at sentencing and was sentenced without the presence of his counsel. There was no waiver of record of the right to counsel. As such, the sentences imposed herein are vacated, and the matter is remanded to the trial court for resentencing.

### Consolidation of Indictments for Trial

On October 29, 2015, well in advance of trial, the State moved to consolidate the trial of the defendant with that of the co-defendant, alleging that the two defendants "participated in the same act or series of acts constituting First Degree Murder; thus, they could have been properly charged in a single charging instrument[,]" and that "[t]he trials of each case would involve essentially the same issues and law enforcement and expert witnesses." The motion was granted that same day. There is no indication in the record that this action was agreed to by either of the defendants, nor is there any indication of record of any objection by the defendants to the consolidation of the cases for trial. The record reflects that both the defendant and the co-defendant were tried together for the murder of Joseph John and the attempted murder of Derricke John and that both were convicted.

In *State v. Mathews*, 00-2115, p. 14 (La.App. 1 Cir. 9/28/01), 809 So.2d 1002, 1013, *writ denied*, 01-2873 (La. 9/13/02), 824 So.2d 1191, and *writ denied*,

16

01-2907 (La. 10/14/02), 827 So.2d 412, the first circuit refused to reverse the conviction of one defendant wherein the separately indicted cases against the two defendants were erroneously consolidated for trial, holding as follows:

> Code of Criminal Procedure Article 706 prohibits the consolidation of separate indictments for trial without the consent of the affected defendants. Designating the act of consolidation as one of amending does not remove the joinder from the strictures of article 706. Although the comments to article 706 explain that the prosecution may avoid obtaining the consent of all of the defendants by charging them in a single bill of indictment, the single bill cannot be a subsequent bill that resulted from the mere consolidation of two prior separate bills of indictment. *See* La.Code Crim. P. art. 706, Official Revision Comment b.

Here, however, the defendant did not timely object to the improper joinder or consolidation. "The objections of misjoinder of defendants or misjoinder of offenses may be urged only by a motion to quash the indictment." La.Code Crim.P. art. 495. Absent a contemporaneous objection, the right to raise the issue is waived. La.Code Crim. P. art. 841; *see State v. Peters*, 298 So.2d 276 (La.1973) (on rehearing). Furthermore, this defect is not jurisdictional, nor does it constitute a denial of due process. *Id.* Accordingly, because the defendant failed to object to the consolidation of the cases for trial, that error was waived.

## DISPOSITION

For the reasons stated herein, we affirm the convictions of the defendant for first degree murder and attempted first degree murder. However, we vacate the defendant's sentences and remand the matter to the trial court for resentencing consistent herewith.

**CONVICTIONS AFFIRMED; SENTENCES VACATED; AND REMANDED FOR RESENTENCING.**